

EXHIBIT "A"

# SUMMONS TO THE SHERIFF OF WILSON COUNTY

## STATE OF TENNESSEE

## CHANCERY COURT OF WILSON COUNTY

_Anne Hendrick_

_Latrice Hendrick_ _____ **Plaintiff**

**vs**

_Hamid Mashhoon (and Karen_
_Carey Securities)_
_Embassy Inc Investors LLC_
_IV Whisler Investors LLC_
_Sky Mashhoon Family Trust_
_Charlie Kaehr Hamid Shook_ _____ **Defendant**

_____ **Defendant**

_____ **Defendant**

**CIVIL ACTION**

NO. _2014-CV-169_

**SUMMONS**

To the above named Defendant(s):

_Charlie Kaehr_

You are hereby summoned and required to serve upon _____ _Anne Hendrick_ _____,
plaintiff's attorney, whose address is _____ _7162 Valley View Cr Mt Juliet TN 37122_ _____
and answer to the complaint which is herewith served upon you within thirty (30) days after service of this summons upon you, exclusive of
the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint.

Witness, Barbara Webb, Clerk and Master of said court, issued at office the

_____ of _March_ _____ A.D. 20 _14_ _____

TESTE: First Monday in _March 24_, 20 _14_ _____ _Barbara Webb_ _____

**Barbara Webb, Clerk and Master**

By _____ _Deputy Wood_ _____

**Deputy Clerk and Master**

Received this _____ day of _____

_____, 20 _____

_____

**Deputy Sheriff**

(This summons is issued pursuant to Rule 4 of the Tennessee Rules of Civil Procedure.)

SUMMONS CIVIL ACTION CHANCERY COURT, WILSON COUNTY, TENNESSEE
RETURN ON SERVICE OF SUMMONS

I hereby certify and return, that on the _____ day of _____ , 20 _____ ,

I served this summons together with the complaint herein as follows: _____

_____

_____

_____

_____
Sheriff

_____
Deputy Sheriff

_____
County

RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the _____ day of _____ , 20 _____ ,

I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the

complaint in case # _____ to the defendant, _____

, on _____ day of _____ , 20 _____ , I received the return receipt, which had been

signed by _____ on the _____ day of _____ ,

20 _____ . The return receipt is attached to this original summons to be filed by the Chancery Court Clerk and Master.

Sworn to and subscribed before me on this _____

day of _____ , 20 _____ .

Signature of: _____ Notary Public or _____ Deputy Clerk and Master

_____

My commission expires:                                            _____
                                                                 Signature of plaintiff, plaintiff's attorney or other person
                                                                 authorized by statute to serve process.

CERTIFICATION (IF APPLICABLE)

I, Barbara Webb, Clerk and Master of the Chancery Court in the State of Tennessee, Wilson County, do certify this to be a true and
correct copy of the original summons issued in this case.

Barbara Webb, Clerk and Master

by: _____ X

D.C. & M.

26-2-301   26-2-301 PROCEDURE FOR EXERCISING EXEMPTION
NOTICE

TO THE DEFENDANT (S): 10          $10,000.
Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgement. If
a judgement should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of
the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as
necessary; however, unless it is filed before the judgement becomes final, it will not be effective as to any execution or garnishment issued
prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary
wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits,
the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand
your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

F I L E D

A.M. MAR 24 2014 P.M.
10.30
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT WILSON CO. TN

# IN THE CHANCERY COURT FOR WILSON COUNTY, TENNESSEE AT LEBANON

JAMES HAMBRICK,
DENISE HAMBRICK

Plaintiffs

v.

HAMID MASHHOON, CAROL PERRIN,
BELAIR @ BECKWITH LLC
FORMERLY CRK REAL ESTATE LLC,
RM WILSON COUNTY INVESTOR, LLC,
MOUNT JULIET INVESTOR LLC,
THE MASHHOON FAMILY TRUST
CHARLES KAELIN, MARCUS FRENCH,

Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2014-CV-109

FOR JUDICIAL DETERMINATION
AND/OR JURY TRIAL

# CIVIL COMPLAINT

# TABLE OF CONTENTS

1. **CIVIL COMPLAINT – HAMBRICK V. CRK ET AL**

   a.  *Request and Memorandum of Law*

   b.  *Foreword*

   c.  *Concise Summary/History*

   d.  *Counts*

   e.  *Closing Argument*

   f.  *Prayer and Request for Relief*

   g.  *Notice of Service*



F I L E D
MAR 2 4 2014
A.M. 10:35 P.M.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT WILSON CO, TN

2. REQUEST FOR ADMISSIONS & DISCOVERY

   EXHIBITS:

3. AFFIDAVITS OF JAMES AND DENISE HAMBRICK

4. *HAMBRICK/CRK/RMWILSON DOCUMENTATION

   a.  *"Option to Purchase Real Estate" - February 2006*

   b.  *Hambrick/RM Wilson County Investor LLC Sale Contract – February 2008*

   c.  *Hambrick/RM Wilson County Investor LLC Closing Documentation – March 30, 2008*

   d.  *Hambrick Closing Package for Purchase of Present Home – October 6, 2006*

5. *RELATED DOCUMENTATION

   a.  *Wilfong/CRK Restated Contract of Sale- October 12, 2005*

   b.  *CRK/RM Wilson "Option Agreement and Escrow Instructions"- September 25, 2006*

   c.  *CRK "Restated Operating Agreement" of September 25, 2006.*

   d.  *CRK/Mount Juliet Investor LLC Loan Documentation - October 5, 2006.*

6. COURT TRANSCRIPT/ORDER – Wilfong v. CRK et al RE: "Profits of Sale" March 6, 2006

7. OVERHEAD MAP OF SOUTHEAST QUADRANT OF I-40/BECKWITH ROAD INTERSECTION

8. AFFIDAVIT OF JAY ROBERT WILFONG

*To be further supplemented within ten calendar days of date of filing.*

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 5 of 107 PageID #: 9

# TABLE OF CONTENTS

1. **CIVIL COMPLAINT – HAMBRICK V. CRK ET AL**



a.  *Request and Memorandum of Law*

b.  *Foreword*

c.  *Concise Summary/History*

d.  *Counts*

e.  *Closing Argument*

f.  *Prayer and Request for Relief*

g.  *Notice of Service*

2.  REQUEST FOR ADMISSIONS & DISCOVERY

EXHIBITS:

1.  AFFIDAVITS OF JAMES AND DENISE HAMBRICK

2.  *HAMBRICK/CRK/RMWILSON DOCUMENTATION

a.  *"Option to Purchase Real Estate" - February 2006*

b.  *Hambrick/RM Wilson County Investor LLC Sale Contract – February 2008*

c.  *Hambrick/RM Wilson County Investor LLC Closing Documentation – March 30, 2008*

d.  *Hambrick Closing Package for Purchase of Present Home – October 6, 2006*

3.  *RELATED DOCUMENTATION

a.  *Wilfong/CRK Restated Contract of Sale- October 12, 2005*

b.  *CRK/RM Wilson "Option Agreement and Escrow Instructions"- September 25, 2006*

c.  *CRK "Restated Operating Agreement" of September 25, 2006.*

d.  *CRK/Mount Juliet Investor LLC Loan Documentation - October 5, 2006.*

5.  COURT TRANSCRIPT/ORDER – Wilfong v. CRK et al RE: "Profits of Sale" March 6, 2006

7.  OVERHEAD MAP OF SOUTHEAST QUADRANT OF I-40/BECKWITH ROAD INTERSECTION

8.  AFFIDAVIT OF JAY ROBERT WILFONG

*To be further supplemented within ten calendar days of date of filing.*

2


FILED
MAR 2 4 2014
A.M. 10:35 P.M.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT WILSON CO, TN

## IN THE CHANCERY COURT FOR WILSON COUNTY, TENNESSEE AT LEBANON

JAMES HAMBRICK,
DENISE HAMBRICK

   Plaintiffs

v.

HAMID MASHHOON, CAROL PERRIN,
BELAIR @ BECKWITH LLC
FORMERLY CRK REAL ESTATE LLC,
RM WILSON COUNTY INVESTOR, LLC,
MOUNT JULIET INVESTOR LLC,
THE MASHHOON FAMILY TRUST
CHARLES KAELIN, MARCUS FRENCH,

   Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FOR JUDICIAL DETERMINATION
AND/OR JURY TRIAL

# CIVIL COMPLAINT

# INITIAL REQUEST FOR DISCOVERY

IN THE CHANCERY COURT FOR WILSON COUNTY, TENNESSEE AT LEBANON

JAMES HAMBRICK,                          )
DENISE HAMBRICK                          )
                                         )
Plaintiffs                               )
                                         )
v.                                       )     FOR JUDICIAL DETERMINATION
                                         )          AND/OR JURY TRIAL
                                         )
HAMID MASHHOON, CAROL PERRIN,            )
BELAIR @ BECKWITH LLC                    )
FORMERLY CRK REAL ESTATE LLC,            )
RM WILSON COUNTY INVESTOR, LLC,          )
MOUNT JULIET INVESTOR LLC,               )
THE MASHHOON FAMILY TRUST                )
CHARLES KAELIN, MARCUS FRENCH,           )
                                         )
Defendants                               )

FILED
A.M. MAR 2 4 2014 P.M.
10:35
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT WILSON CO, TN

## CIVIL COMPLAINT

Plaintiffs James and Denise Hambrick, presently represented pro se, now come before this Honorable Court,  pursuant to *Tennessee Rule of Civil Procedure 8.01: Claims for Relief*, now bring suit against the above named Defendants and pray for the Court's relief.  Plaintiffs ask for expeditious application of law and Judicial Determination through the facts cited and reviewed herein by this Honorable Court.  Plaintiffs further move the Court to take into account the settled issues in the matter of Wilfong v. CRK et al as they are part and parcel and fully corroborate all Counts of this Complaint, as alleged by Plaintiffs.

*Foreword* - As a foreword, the Hambricks have recently made the acquaintance of Mr. Jay Wilfong, who was also an owner of property near the Hambricks' home, the subject property at issue in this Complaint.  The Wilfong and Hambrick properties are now part of what is known as the Belair @ Beckwith "Wilson County Project".  The Hambricks and Wilfong have agreed to freely exchange information and understanding of the events that led to this Complaint, as well as those that led to Mr. Wilfong's Complaint filed in 2008.  When the events, facts and documentation are laid over each other in a timeline, a clear and ongoing pattern of illegal, conspiratorial, fraudulent and egregious business practices is proven, which is now presented for determination, resolution and all available legal and equitable remedies to be determined by this Honorable Court.                                    3

**Tolling Period/Statute of Limitations.** The Plaintiffs advance several theories to a possible defense claim related to the expiration of tolling periods. **One.** Plaintiffs assert and will prove that Defendants were of one mind, operating in concert and that corporate separation and immunity should be denied. Three binding contracts were entered into between the parties, between February 18, 2006 and March 30, 2008, *which merged as one underlying contract and the tolling period has not expired prior to the date of filing.* **Two.** In the alternative, the Plaintiffs aver that the very latest date the tolling period commenced was on March 30, 2008 in the execution of a sale contract of Hambricks' property and the previous contractual agreements were incidental and causitive to the substantial monetary loss of the Hambricks, through an unjust enrichment through fraud by the Defendants. **Three.** Litigation was commenced in 2008 *(Wilfong v. CRK et al)* that has revealed various actions, issues and material breaches. Discovery has been ongoing in that litigation. Accordingly, by equity, if not also by law, the tolling periods should not be determined to have expired.

**Damages.** The Hambricks aver that they will prove they were monetarily damaged in amounts that may exceed $5,000,000 that will need to be arrived at through judicial and jury determination.

*Concise Summary/History* - This matter examines the sale of the Plaintiffs' home and surrounding property to Defendant RM Wilson County Investor LLC, on March 30, 2008 and related issues.

In early 2006, Defendant CRK Real Estate LLC, then solely owned by Defendant Charles R. Kaelin and represented by its agent Defendant Marcus French, approached Plaintiffs and their neighbors Robert and Deborah Tuck, proposing real estate agreements for exclusive purchase and marketing rights to the Hambrick and Tuck properties for a two year period. Unbeknownst to the Plaintiffs at that time, CRK had also entered into a type of profit sharing contract with another closeby land owner named Jay Wilfong. *(See Exhibits 3, 4a)*

The three above mentioned properties have similar charactistics in that they are **key land-parcels**, relative to the whole of CRK's land-holdings located in the southeast quadrant of the intersection of Interstate 40 and Beckwith Road. This quadrant of land is what CRK/Belair @ Beckwith now refers to as its "Wilson County Project". CRK's "Wilson County Project" began in 2006 despite CRK's contractual obligations to various parties to resell properties and share profits.

4

The Hambricks' valuable subject land parcel is one of only four **cornerstone** tracts of CRK's "Wilson County Project" land-holdings and has considerable road frontage on two roads, at the intersection of Posey Hill Road and South Posey Hill Road. *(See Exhibit 7)*

Note: The property still owned by Plantiffs' neighbors Robert and Deborah Tuck, is also a key tract in that, similar to the Wilfong land, it is a dividing strip of land and has road frontage on the southern boundary of the CRK land-holdings, which would add significant value to CRK's holdings. *(See Exhibit 7)* Upon information and belief, CRK's efforts to obtain the Tuck property after their contract expired were unsuccessful but at the same time illustrative of the Defendants' tactics and business ethics as they made repeated efforts to drive down the Option price after the Option expired. Interestingly, the Court envisioned such a scenario and actually put it into the spoken record. *(See Exhibit 6)*

**February 18, 2006.** After a period of negotiations with French and Kaelin (CRK/Kaelin) the Plaintiffs entered into a two year exclusive purchase option agreement ("*Option to Purchase Real Estate*") with Defendant CRK Real Estate LLC on February 18, 2006. The *Option to Purchase Real Estate* agreement provided CRK the exclusive purchase and marketing rights of the Hambricks' home and land located on Posey Hill Road, east of Mt. Juliet and is a part of CRK's development project. These subsequent agreements caused the Hambricks and the Tucks to not market or be able to resell their properties on their own, without first gaining approval of CRK for a two year period. The profit-sharing provision was the major consideration of the **total** of the considerations that enticed the Hambricks to enter into such agreement. *(See Exhibits 3 & 4a)*

CRK, through its agent Marcus French and owner Charles R. Kaelin, represented that CRK was assembling land parcels in the Beckwith Road/Posey Hill Road area **to resell** as a group to a future investor or developer. At no time did CRK, Kaelin or French disclose or mention any alternate plan to keep the land long term or convey it to an affiliated party or that CRK might enter into a joint venture to develop the land, instead of reselling it. *(See Exhibit 3)* Such alternate plans would make CRK's offer of shared revenues moot, whereas the promises of profit-sharing enticed the Hambricks to enter into the agreement. CRK had a duty to keep its word and to market and accept a reasonable offer during a full two year period afterward. *(See Exhibit 4a)*

Additionally, CRK agreed to pay the Hambricks the substantial sum of $660,000 in the event it exercised its option to purchase the Hambricks property or if it were successful in reselling the

property.   CRK further enticed the Hambricks to enter into the agreement by offering to actively market the Hambricks property for resale for the two year period and then share profits of a resale of the Hambricks property "in excess" of the $660,000.  This agreement – including the "in excess" dividing of profit provision, was authored by the law firm of Rochelle, McCulloch & Aulds of Lebanon, Tennessee.  *(See Exhibit 4a)*

The Hambricks have noted that the wording drafted into their agreement *(the Option to Purchase Real Estate)* regarding sharing the profits was similar in nature to the wording of the "Profits of Sale" provisions of the "Restated Contract of Sale" in the Wilfong v. CRK et al litigation.  *(See Exhibits 4a & 5a)*

In fact, the Hambricks aver that the wording is the same in meaning as the Wilfong/CRK wording that was *actually contested by CRK itself* with resulting judgment for Wilfong.   To be noted, CRK itself attempted to impeach the quality of its own attorney's work, after itself drafting almost verbatim language in the Hambrick and Tuck contracts.  *(See Exhibits 3a, 4a & 6)*

The Hambricks adopt the Court's determination of the formula to calculate profit sharing and that formula should apply equally as the benchmark formula for this instant matter. That calculation calls for a determination of the **consideration**s paid for land, then converted to a percentage of total considerations committed for all of CRK's holdings, to establish relativity.  *(See Exhibit 6)*

After executing the agreement with CRK, the Hambricks then began to wait for their property to be resold while going about their normal lives.  They placed their trust  in CRK.

Sometime on or around July or August of 2006, the Hambricks were notified by CRK agent French that CRK would be exercising its option to purchase their property.   Upon information and belief, this notification coincides with an email notification from CRK, through French, to Wilfong in July of 2006, that CRK had entered into a sale of the land and that a closing would take place "in about ninety days" and Wilfong also would be paid off. *(See Exhibit 8)*

Upon the notification by French, the Hambricks were compelled to begin searching for a new home. After touring several possible homes and making offers, they were able to purchase a new home, with a loan provided by F & M Bank, secured in part upon the strength of the notication from CRK and the "Option to Purchase Real Estate" agreement. The Hambricks then moved into their new home on or around October 6, 2006. *(See Exhibits 3 & 4d)* However, CRK did not keep their word. CRK did not buy the Hambricks property for $660,000 or pay them a profit-share which left the Hambricks being liable for two mortgage payments, which they would struggle to pay for the next one and one half years, as their previous home sat empty. *(See Exhibits 3 & 8)*

After years of wondering what had happened with their agreement with CRK, (on or around March 14, 2014) the Hambricks learned that on September 25, 2006, Defendant Kaelin secretly conveyed control of the CRK land-holdings, including the Hambrick property to Defendant Hamid R. Mashhoon and Mashhoon's RM Wilson County Investor LLC, of which Defendant Carol Perrin was a partner and instrumental in the conception and drafting of the improper and interfering agreements. *(See Exhibits 3, 5b, c & d)*

On October 5, 2006 CRK further restricted and altered the agreement by involving the Hambrick property in a large credit line loan between Hamid Mashhoon's "Mt. Juliet Investor LLC as Lender to Borrower CRK. Ironically, as history later revealed, the Hambricks moved into their new home one day after CRK obtained a purported "loan" from Hamid Mashhoon's Mount Juliet Investor LLC, with an available credit line of over $20,000,000. Despite CRK's promises and their capabilities to purchase the Hambrick property, they failed to do so. The Hambricks also later discovered that Wilfong was not paid at that time either, nor were the Tucks. *(Exhibits 3, 5d, 8)*

The Hambricks would also later learn that in that same time period, on the date of September 25, 2006 **RM became contractually obligated to purchase** the CRK land-holdings, through the "Option Agreement and Escrow Instructions". *(See Exhibits 3, 5b)* The Hambricks adopt and agree with Wilfong's position that the obligation to purchase the CRK land is additional proof that the transactions between CRK/Kaelin to Hamid Mashhoon and his various alter ego corporations **constituted a sale**, which should have triggered payment to the Hambricks, as well as Wilfong and

7

the Tucks.  However, the transfers of interest were concealed and kept concealed through years of conspiratorial cover-ups by the Defendants which remain ongoing.  *(See Exhibits 3, 5b, c & d)*

These transfers of ownership and control of CRK's assets and management were not disclosed to the Hambricks by the Defendants but instead were revealed to the Hambricks and the Tucks by Mr. Wilfong upon his recent discovery of their involvement. *(See Exhibits 3, 8)*

One must ask what was the purpose of these interferences, breaking of promises and duties, and their subsequent concealment?  To study that question; Charles R. Kaelin, solely owned CRK until September of 2006.  Sometime prior to that, around July 1, 2006 CRK/Kaelin entered into a sale agreement of the entire CRK land holdings to an Atlanta company named "Opus South" who was a large land development corporation.  CRK/Kaelin **also**, at the same time, had signed a sale contract with the "Turley Brothers" land development company.  Also,  upon information and belief, during that same time period, Hamid Mashhoon, Carol Perrin and Charles R. Kaelin became acquainted and started discussing some type of purchase of CRK or a joint venture arrangement.  On September 14, 2006 Mashhoon and Perrin constructed RM Wilson County Investor LLC, who would be the "Manager of CRK" and Mount Juliet Investor LLC, would be the "Lender" of money to CRK.  All entities were then owned and/or fully controlled by Hamid Mashhoon, with Carol Perrin's assistance.  Perrin was rewarded with a 6% "Assignment of Revenues" from RM.

Upon the formation of these corporations by Mashhoon, the Opus South and Turley Brothers contracts for unknown reasons were not consummated.  An additional contract to Red Mountain Retail Group was also not consummated.   It is the position of the Hambricks that all three of these buyers were capable and the contracts were viable but Mashhoon and Perrin convinced Kaelin to accept Mashhoon's proposal instead.  The Hambricks aver that it was the Defendants' plan, so as not to trigger various payments for profit sharing, realtor's commission and other obligations, to concoct a fraudulent transfer scheme disguised as a "loan" when in reality it was a full conveyance/sale of CRK, with a possibility that Kaelin might retain a small interest.  *(See Exhibit 8 and also note that Plaintiff's will supplement this Complaint with copies of referenced sale agreements within 10 days of date of filing.)*   Kaelin's ownership of CRK and its assets would shift to Mashhoon's Mount Juliet Investor LLC or  Mashhoon's RM Wilson County Investor LLC through a series of loan

8

payment defaults, which is what actually occurred. These were acts of fraud, conspiracy and interference that covertly breached contracts and denied the Hambricks, Wilfong, the Tucks, Opus South, Turley Brothers and realtor Mark Baziak significant sums of money. *(See Exhibits 3, 5a, b, c, d 6 & 8 and also note that Plaintiff's will supplement this Complaint with copies of referenced sale agreements within 10 days of date of filing.)*

Upon information and belief, this September/October 2006 Fraudulent Transfer scheme was conceived and drafted by Carol Perrin, who was Mashhoon's partner, associate and attorney with the Los Angeles law firm of Greenberg Traurig, of which Mashhoon was a client. *(See Exhibits 5b, c, d 6 & 8)*

The most horrendous "Executed Agreement" was titled the *"Option Agreement and Escrow Instructions"*, that gave Mashhoon's interests full control, in which the parties agreed that the CRK land-holdings would not be resold for a period of ten years, which was a material breach of the Hambricks agreement that required CRK to make good faith efforts to resell the Hambricks' property and share profits with them. *(See Exhibits 5b)* The *Option Agreement and Escrow Instuctions* also committed the CRK land-holdings **to be sold to RM Wilson,** as well as **provided RM Wilson the exclusive purchase option,** thereby making a sale to anyone else impossible, thereby destroying the rights of the Plaintiffs, the Tucks and Wilfong. *(See Exhibits 5b)*

These alterations and changes of the plan without the knowledge and consent of the Hambricks were purposely concealed from the Hambricks by all of the above named Defendants, as illustrated by the historical record.

After breaking their promise to the Hambricks in September of 2006, leaving the Hambricks saddled with two mortgage payments and without the benefit of their bargain, immediately upon the expiration date of the Option agreement on February 17, 2008, Defendants Kaelin and French approached the Hambricks attempting to broker a sale of the Hambricks land to Defendant RM Wilson, at a greatly reduced price and without the promised profit-sharing consideration. **Kaelin and French did not disclose to the Hambricks that their Option agreement had been interfered with and was materially breached in September of 2006, nor did they disclose to the Hambricks that RM Wilson and CRK were one and the same, under the ownership and control of Hamid Mashhoon and his RM Wilson company, acting as "Manager" of CRK.**
*(See Exhibits 3, 4a, b, c & 5a, b, c, d)*                                                                9

Two days afer the expiration date of the Option Agreement, the financially stressed Hambricks gave in and agreed to sell their home and property to Defendant Mashhoon's RM Wilson County Investor LLC, *not knowing that Mashhoon, Perrin and RM itself had interfered and caused the material breach of the Hambricks contract.* **RM failed the Hambricks not only in its capacity of "Manager of CRK" but also as the actual interfering party.** *(See Exhibits 5a, b & c)*

As the Court surmised and envisioned and made part of the public record, and without knowing the accuracy of the thought expressed at the time, Mashhoon, Perrin, Kaelin, French, CRK and RM waited until the Hambricks valid contract ran out and then used the Hambricks financial condition at that time to their unjust advantage and for further unjust gain. *(See Exhibit 6)*

The highly discounted sale of the Hambrick property to Mashhoon's RM Wilson County Investor LLC was consumated on or around March 31, 2008 and the Mashhoon faction has enjoyed *"the excess"* ever since. *(See Exhibit 4d)*

*The Mashoon Family Trust is named as a Defendant for its role in knowingly providing fundings to facilitate the following Counts:*

## COUNTS ALLEGED BY THE PLAINTIFFS

<u>Counts I & II</u> **Breach of Contract and Purposeful Breach of Fiduciary Duties/Good Faith Practices**

*NAMED DEFENDANTS:* All Afforementioned Defendants

1. Defendants CRK Real Estate LLC, Charles R. Kaelin and Marcus French knowingly breached the provisions of CRK's contract with the Plaintiffs to utilize good faith efforts to resell Plaintiffs' subject property for a full two year period of time when those efforts were discovered recently to have been stopped as a result of covert and concealed agreements between themselves and named Defendants Hamid Mashhoon, Carol Perrin and RM Wilson County Investor LLC on September 25, 2006.

10

2. The above named Defendants engaged in, conspired to, facilitated and/or transferred all or interests therein of ownership and control of the CRK land-holdings and control of the company in a manner designed to illegally eliminate the Contract Rights of the Plaintiffs and others; covered those actions up and failed to compensate the Plaintiffs for resulting damages.

3. The above named Defendants engaged in, conspired to, facilitated and/or further breached the Plaintiffs contractual rights by concealing and misrepresenting the history of the marketing efforts to then negotiate a subsequent resale of the property to an undisclosed affiliate acting as a Kingpin undisclosed overseer of the acts.

4. As a catch all Count of egregious behavior, the above named Defendants grossly breached their fiduciary and/or good faith methods and motives and duties to the Hambricks by their actions, concealment and fraudulent cover-up that was never disclosed but instead was only discovered years later as a result of other similar actions against a separate party.

**Count III** **Intentional Procurement of Breach of Contract Through Fraud and Conspiracy**

*NAMED DEFENDANTS:* Hamid Mashhoon, Carol Perrin and RM Wilson County Investor LLC

Defendants Hamid Mashhoon, Carol Perrin and RM Wilson County Investor LLC knowingly interferred with the Plaintiffs' contractual rights which allowed Plaintiffs a two year unconditional period of time that Defendants CRK Real Estate LLC was obligated to use good faith efforts to market for resale the Plaintiffs Posey Hill Road subject property and share profits from that resale with the Plaintiffs. The Defendants Mashhoon and Perrin conceived and constructed the corporation RM Wilson County Investor LLC to interfere with and eliminate monetary and other obligations to the Plaintiffs and other persons/parties for their own unjust enrichment. Mashhoon, Perrin and RM Wilson County Investor LLC, as sophisticated persons aided by competitent legal counsel performed significant due diligence to gain a prior understanding of the contractual obligations CRK owed various parties prior to Mashhoon, Perrin and RM's entrance and involvement with CRK. Perrin and Mashhoon then constructed a series of complex business agreements to eliminate the rights of others to keep the benefits for themselves.

11

## Count IV  Unjust Enrichment Through Multiple Acts of Fraud, Concealment and Conspiracy

**NAMED DEFENDANTS:**  CRK, Hamid Mashhoon, Carol Perrin and RM Wilson County Investor LLC

The aforementioned interferences and material breaches of contractual rights were made possible, before and after September 25, 2006 by significant acts of Fraud, Concealment and Conspiracy. The unclean and inequitable results of those acts were the substantial loss of the Hambricks profit-sharing sum, which should have been calculated and paid on September 25, 2006 through the Material Breach of Contract and upon the Sale/Conveyance of CRK's land assets and corporate control, all or in part, through a transfer designed to defraud creditors and those with future rights to substantial sums of monies otherwise due them.

## Counts V and VI  Civil Violations of the Racketeer Influenced Corruption Act and Mail Fraud

**NAMED DEFENDANTS:**  Hamid Mashhoon and Carol Perrin

Plaintiffs aver that Defendants Hamid Mashhoon and Carol Perrin engaged in a pattern of constructing shell and sham corporations and business agreements to wrongfully insulate themselves from illegal acts performed by and through these corporations and their operating agents and employees, which resulted in significant damages to the Plaintiffs. Mashhoon and Perrin repeatedly violated the provisions of the RICO Act. Mashhoon and Perrin acted as behind the scenes kingpins conceiving, constructing, causing, funding, administering and profiting unjustly profiting through illegal acts against the Plaintiff and others, resulting in significant sums of monies withheld and/or taken. that otherwise were fully owed or would be owed to parties of whom CRK was contractually obligated.

This pattern of racketeering activity began in September of 2006, if not before, and has continued unabated through the date of filing of this Complaint.

Defendants Mashhoon and Perrin conspired with and sent their agents Kaelin and French out to wrongfully acquire the Plaintiffs' home residence property at a time the Plaintiffs were financially

12

vulnerable, forced to make two separate mortgage payments because the Defendants did not pay monies owed to them on September 25, 2006. The Defendants took advantage of the Plaintiffs financial circumstances despite their own default of contractual rights held by the Plaintiffs. The Defendants perpetrated these egregious actions against the Hambricks through purposeful misrepresentation, acts of fraud, contractual breach, concealment and conspiracy, through further instruction to their henchmen Kaelin and French.. All named Defendants participated in these illegal acts under the control and guidance of Defendants Mashhoon and Perrin.

Plaintiffs further aver that this fraud perpetrated by Defendants RM Wilson and Hamid Mashhoon, to unjustly enrich themselves by purchasing the Plaintiffs property through fraud, at a time Defendants themselves were in breach to the Hambricks rights and at a time the Hambricks were financially troubled, was faciliated by the Defendants' usage of the United States mail and constitued an act of mail fraud and the civil penalty should be applied.

### 18 U.S. Code § 1341 - Frauds and swindles (as to Mail Fraud)

**U.S. Code as to Mail Fraud**; "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both." (Close quote.)

The Plaintiffs' allegations of RICO as a civil action *is* appropriate and proper in this instant matter

13

as there is significant evidence and history that indicates an ongoing pattern of illegality. Upon information and belief, violations of RICO were also asserted against the Defendants previously, but were dismissed as they had not yet been proven. Other acts falling under the scope of civil RICO are instances of malicious prosecutorial efforts in retribution against present and prior victims of RICO violators and upon information and belief of the Plaintiffs the Defendants have engaged in those efforts, which establishes yet another prerequisite to allege RICO violations are properly specified by the Plaintiffs as a Count.

Under the RICO statutes, the meaning of **racketeering activity** is set out at <u>18 U.S.C. § 1961</u> and includes (in part); "Any act of <u>bribery</u>, <u>counterfeiting</u>, **theft, embezzlement, fraud**, dealing in obscene matter, <u>obstruction of justice</u>, <u>slavery</u>, **racketeering**, <u>gambling</u>, <u>money laundering</u>, commission of <u>murder-for-hire</u>, and many other offenses covered under the Federal criminal code (<u>Title 18</u>)". *(bold and enlarged font added by Plaintiffs for emphasis.)*

Under the Federal Criminal Code Title 18 Plaintiffs allege that the Defendants Mashhoon and Perrin may have also violated various items of the following Chapters;

- 31 Embezzlement and Theft

- 63 Mail Fraud

- 95 Racketeering

- 96 RICO

The Plaintiffs further allege that Mashhoon and Perrin have engaged in a clear and provable pattern of racketeering activity that is ongoing in this instant matter and against other victims and such actions may be a legitimate cause for a criminal referral. A **clear pattern** requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity. The <u>U.S. Supreme Court</u> has instructed federal courts to follow the continuity-plus-relationship test in order to determine whether the facts of a

14

specific case give rise to an established pattern. Predicate acts are related if they **"have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."** (_H.J. Inc. v. Northwestern Bell Telephone Co._) Continuity is both a closed and open ended concept, referring to either a closed period of conduct, or to past conduct that by its nature projects into the future with a threat of repetition." (Close Quote) Plaintiffs aver that a very clear pattern of RICO violations and coverups has emerged and surely must be apparent.

**Count VII – Promissory Fraud**

_**NAMED DEFENDANTS:**_ CRK Real Estate LLC, RM Wilson County Investor LLC, Hamid Mashhoon, Charles R. Kaelin, Marcus French

The Plaintiffs aver that sometime prior to October of 2006, CRK, through its agent Marcus French, represented to the Plaintiffs that it promised to exercise its option to purchase the Hambrick property in October of 2007 but then subsequently failed to do so despite having the financial resources at hand, through its MJI credit line loan of October 5, 2006. This breach of promised performance caused the Hambricks substantial harm.

Upon that notification by French, the Hambricks then hired a realtor to aid them in finding and purchasing a new home. The Hambricks then located and purchased a new home based upon French's representations. The Hambricks obtained a loan from F & M Bank, based upon the representation made to them and by virtue of the _"Option Agreement to Purchase Real Estate"_ with CRK they had entered into earlier in 2006. When CRK refused to then go forward with their promised purchase, this left the Hambricks in continued financial duress as they then were required to pay two mortgage notes which ultimately caused the Hambricks to be forced to sell. Months later, CRK through French and Kaelin again approached the Hambricks "offering" to facilitate a sale of their property **for $160,000 less than the Option price** to a company they referred to as "RM Wilson County Investor LLC". French and Kaelin did not disclose that RM and CRK were one and the same and that RM was actually the Manager of CRK.

_**The Hambricks aver that CRK promised to purchase their home in October of 2007; had the resources to do so but then subsequently used the Hambricks financial circumstances to force the price down only five months later, to the Defendants unjust benefit.**_                15

## *Closing Argument*

Although the Hambricks do not assert that they were harmed emotionally or physically, the Hambricks allege that they were significantly financially harmed by the interference and breach of contract in that they should have been paid on the date of the breach and interference, that being September 25, 2006 but were not paid at all for the difference between $660,000 as the Option purchase price and $500,000, nor were they allowed the benefit of a one half share of profits they were entitled to, that were made impossible to obtain by their destruction through interference and material breach. The Hambricks further aver that Defendant Hamid Mashhoon was unjustly enriched by keeping the $160,000 difference and by keeping a much, much larger amount that otherwise would have been paid to the Hambricks as a share of profits. An amount equal to those lost profits, destroyed by Mashhoon, Perrin and their RM Wilson County Investor LLC should have been paid and received by the Hambricks in September of 2006 but were not, mirroring the destruction of Wilfong's rights in Wilfong v. CRK et al.

The Hambricks aver that by information and belief the CRK land valuation must be set at the amount of $106,000 per acre, as that was the amount offered by Opus South, which was set to close at the same time Mashhoon interfered. Taking into account the sum of the various considerations committed by CRK for the purchase of their land (including a weighted future liability for a profit share payment), that would be due them under their agreement, then extrapolated to a sum equal to the lost profit share and the wrongly taken discount of $160,000, then result in a rough total of $2,000,000 to $4,000,000 under the same formula established in the Wilfong v. CRK et al matter. Further, said sum is subject to trebling of award under provisions of both Procurement of Breach of Contract. *Note: It is not ascertainable yet to Plaintiffs the amount of total considerations CRK was liable for to purchase all of its land-holdings and accordingly it is not possible to state with certainty what the lost profit share amount total is.*

The Hambricks aver that the various Executed Agreements between Mashhoon, Kaelin, CRK and Mashhoon's RM Wilson Defendants, entered into on September 25, 2006 in all ways and in all manners were a full conveyance, sale, bargaining and transfer of the CRK land-holdings and corporate control which was perpetrated by the Defendants and their attorneys to unjustly enrich

16

themselves, at the expense of several individuals and corporations who were entitled to the benefits of what they had bargained for. *These transactions were a Fraudulent Conveyance, illegal under the Uniform Fraudulent Conveyance Act under Tennessee law, again providing a trebling of damages by statute.*

## Prayer and Request for Relief

The Hambricks ask this Honorable Court to find on all Counts for the Plaintiffs and to send a clear message to those people everywhere that such abuses of power, money and the legal system itself will never be tolerated without exceptional and punitive penalties, resulting from those acts.

The Hambricks ask that the Court adopt the evidence presented herein, in conjunction with the evidence and findings of the Wilfong v. CRK et al matter and *grant swift, full and following relief and findings for the Plaintiff's Counts as to;*

Breach of Contract, Tortuous Interference and Unjust Enrichment Facilitated through acts of Fraud and Civil Conspiracy.

Purposeful Breaches of Fiduciary Duties.

Violations of RICO law.

Promissory Fraud.

That the Corporate Veil of Protection be Pierced.

That the Sale Contract of the Hambrick Property to RM be rescinded.

That the Court utilize the same formula calculation for speculative lost profits, as ordered in the matter of Wilfong v. CRK et al, to then be trebled and awarded.

That the Court find for the Plaintiffs on all Counts and award and allow all damages provided for under the law.

17

That all legal fees and costs be Ordered paid by the Defendants;

And for all other just and reasonable relief at the discretion of this Honorable Court.

Respectfully submitted to this Honorable Court, the 24th day of March, 2014, by James and Denise Hambrick, as current pro se litigants/Plaintiffs.

**JAMES HAMBRICK - Plaintiff**                    **DENISE HAMBRICK - Plaintiff**

1702 Valleyview Drive

Mount Juliet, TN. 37122

**THIS MATTER SET FOR AN INITIAL HEARING ON _____, 2014.**

### NOTICE OF SERVICE

We, the Plaintiffs, James and Denise Hambrick affirm that a true and authentic copy of this Complaint has been served on this same date to all Defendants by hand delivery to Defendants' legal counsel and further by certified mail to the individual Defendants at their known addresses.

**JAMES HAMBRICK**                    **DENISE HAMBRICK**

Notary Certificate of Acknowledgment

State of Tennessee
County of Wilson       On March 24, 2014, before me,
_____
(date)
personally appeared, James Hambrick and Denise Hambrick
                                                    (signers)
personally known to me, or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument
WITNESS my hand and official seal

_____
(notary signature)
My Commission Expires: 3.22.2016

(seal)
TINA M. GUINAN
STATE
OF
TENNESSEE
NOTARY
PUBLIC
WILSON COUNTY

18

## PLAINTIFF'S INITIAL REQUEST FOR DOCUMENTS

1. Please provide all communications documentation of all types between the named Defendants for the period of calendar year 2003 through the present time that in any way, shape or form make reference to present, future or past business transactions between the Defendants relative to the CRK land-holdings, CRK corporate ownership and loans between the Defendants.

2. Please provide copies of all documentation in which the names James Hambrick or Denise Hambrick is part thereof.

3. Provide all chain of title documents for the land parcels that secured any loan between the parties that went into default or were guaranteed by Charles Kaelin.

4. Provide signed copies of all agreements between the parties with the Hambricks.

5. Provide a copy, obtained by request from First American Title Company, of the Option Agreement and Escrow Instructions dated September 25, 2006, with signature authorization by First American Title Corporation.

6. Provide copies of board minutes of all Defendant corporations.

7. Provide all documentation related to the departure or employment termination of Defendant Perrin from her position or partnership with Greenberg Traurig.

8. Provide copies of all directives of all types from the Defendant corporations to their agents or associates that in any way, shape or form relate to the Hambrick property at issue.

9. Provide a copy of the first written reference to the "Wilson County Project".

10. Provide copies of canceled loan payment checks.

11. Provide all documentation that establishes the dates and circumstances of the initial talks or negotiations between Hamid Mashhoon, Carol Perrin and Charles R. Kaelin.

12. Provide copies of documentation that establishes which Defendants were in charge of the day to day business operations of the Defendant corporations from the date of the corporations' inception through the present time.

PLAINTIFF'S INITIAL REQUEST FOR ADMISSIONS AND SUPPORTING DOCUMENTS

Please admit or deny each of the following statements and provide Plaintiffs copies or access to documents that support your responses;

1.  On or around February 18, 2006 CRK entered into an agreement with James and Denise Hambrick entitled "Option Agreement to Buy Real Estate".
RESPONSE:

2.  The Option Agreement to Buy Real Estate is a valid, legal, binding contract between the parties.
RESPONSE:

3.  The Option Agreement to Buy Real Estate was drafted by Price Thompson of the law firm of Rochelle, McCulloch and Aulds.
RESPONSE:

4.  The terms of the Option Agreement were enforceable against subsequent owners of CRK.
RESPONSE:

5.  On or around September 25, 2006 Charles R. Kaelin and Hamid Mashhoon, in their capacities in CRK and RM Wilson County Investor LLC, executed a valid, legal and binding "Option Agreement and Escrow Instructions" contract.
RESPONSE:

6.  The "Option Agreement and Escrow Instructions" in part was an agreement that RM Wilson County Investor LLC would have the exclusive purchase right for the Hambrick property during its term.
RESPONSE:

7.  The "Option Agreement and Escrow Instructions" required that the land-holdings attached as its exhibit would not be resold during the term of the agreement.
RESPONSE:

8.  CRK had contractual duties to the Hambricks, the Tucks and Wilfong to market their associated properties for the full term provided in their contracts.
RESPONSE:

9.  Hamid Mashhoon controlled RM Wilson County Investor LLC and Mount Juliet Investor LLC and is a Co-Administrator of the Mashhoon Family Inter Vivos Trust.
RESPONSE:

10. Defendants CRK and Marcus French told the Hambricks CRK would exercise its option and purchase the Hambricks property on or around September of 2006.
RESPONSE:

11. RM Wilson, at Hamid Mashhoon's direction, stopped CRK from paying the Hambricks for their home property and their speculative share of profits.
RESPONSE:

10. Carol Perrin authored the various agreements executed by Defendants Kaelin, Mashhoon, CRK and RM Wilson on September 25, 2006; September 29, 2006 and October 5, 2006.
RESPONSE:

11. Another attorney at the Los Angeles office of Greenberg Traurig authored the various agreements executed by Defendants Kaelin, Mashhoon, CRK and RM Wilson on September 25, 2006; September 29, 2006 and October 5, 2006.
RESPONSE:

12. The law firms of Baker Donelson (Nashville office) an Greenberg Traurig (Los Angeles office) charged over $100,000 for legal services performed on behalf of the various named Defendants of this lawsuit, for the periods of the third and fourth quarters of 2006.
RESPONSE:

13 No monetary loan payment was ever made by either CRK or Charles R. Kaelin for balances due under the October 5, 2006 loan from Mount Juliet Investor LLC.
RESPONSE:

14. When the Mount Juliet Investor loan went into default the properties that secured that loan were repossessed by the Lender, Mount Juliet Investor LLC.
RESPONSE:

15 Mount Juliet Investor LLC sold the repossessed properties to RM Wilson.
RESPONSE:

16 A clear record of the chain of title exists that proves the properties that secured the October 5, 2006 loan from Mount Juliet Investor to CRK, were legally settled and disposed.
RESPONSE:

17.   Hamid Mashhoon, through RM Wilson County Investor LLC, directed Kaelin and French to negotiate a purchase of the Hambrick property after the Hambricks' agreement with CRK expired in February of 2008.
RESPONSE:

18.   RM Wilson purchased the Hambrick property for $160,000 less than the Option price and was no longer liable to pay the Hambricks a share of profits from a resale.
RESPONSE:

19.   Carol Perrin was in charge of operating and managing the Wilson County Project.
RESPONSE:

20.   Kaelin and French were authorized to negotiate with the Hambricks on behalf of RM Wilson.
RESPONSE:

# AFFIDAVIT OF JAMES HAMBRICK


FILED
A.M. MAR 2 4 2014 P.M.
10:35
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT WILSON CO, TN

1. My name is James Hambrick and I am above the age of eighteen years and a resident of Wilson County, Tennessee.

2. I affirm that the statements contained in this affidavit are true and accurate to the best of my knowledge and belief and are based solely upon my personal experience and knowledge of the content.

3. I am the Chief of Police of the City of Mount Juliet, Tennessee.

4. I am married to Denise Hambrick and I understand that she is preparing an affidavit of her own with her individual understanding and knowledge of these same issues.

5. Sometime in 2012, I received a telephone call from a man who identified himself as Jay Wilfong regarding a real estate transaction with CRK Real Estate LLC of a property I formerly owned on Posey Hill Road, east of Mount Juliet.

6. It is my understanding and belief that Wilfong filed a lawsuit against CRK over various issues related to the sale of his land and was trying to figure out some of those details.

7. Mr. Wilfong has asked me if I would be willing to disclose the details and provide copies of various real estate agreements my wife and I entered into with CRK Real Estate LLC in February of 2006 and RM Wilson County Investor LLC, and I have consented to do so, as attested to by this affidavit. (copies of agreements and land sale closing documents attached)

8. Sometime prior to February of 2006, I was approached by a man named Marcus French, on behalf of CRK Real Estate LLC inquiring about our land.

9. I do not recall with certainty if Mr. French mentioned if he was a licensed real estate agent.

10. Mr. French mentioned that CRK was owned by Dr. Charles R. Kaelin.

# AFFIDAVIT OF JAMES HAMBRICK

1. My name is James Hambrick and I am above the age of eighteen years and a resident of Wilson County, Tennessee.

2. I affirm that the statements contained in this affidavit are true and accurate to the best of my knowledge and belief and are based solely upon my personal experience and knowledge of the content.

3. I am the Chief of Police of the City of Mount Juliet, Tennessee.

4. I am married to Denise Hambrick and I understand that she is preparing an affidavit of her own with her individual understanding and knowledge of these same issues.

5. Sometime in 2012, I received a telephone call from a man who identified himself as Jay Wilfong regarding a real estate transaction with CRK Real Estate LLC of a property I formerly owned on Posey Hill Road, east of Mount Juliet.

6. It is my understanding and belief that Wilfong filed a lawsuit against CRK over various issues related to the sale of his land and was trying to figure out some of those details.

7. Mr. Wilfong has asked me if I would be willing to disclose the details and provide copies of various real estate agreements my wife and I entered into with CRK Real Estate LLC in February of 2006 and RM Wilson County Investor LLC, and I have consented to do so, as attested to by this affidavit. (copies of agreements and land sale closing documents attached)

8. Sometime prior to February of 2006, I was approached by a man named Marcus French, on behalf of CRK Real Estate LLC inquiring about our land.

9. I do not recall with certainty if Mr. French mentioned if he was a licensed real estate agent.

10.     Mr. French mentioned that CRK was owned by Dr. Charles R. Kaelin.

11.     Mr. French stated in effect that CRK was assembling land parcels to resell as a package located on or around the Beckwith Road/S. Posey Hill/I-40 area.

12.     After discussing possible transactions, which included a profit sharing consideration upon a resale, my wife and I entered into an agreement with CRK on February 18, 2006, which allowed CRK a two year option to purchase our land for $660,000, as well as the right to market the land with their other land and upon a successful resale CRK agreed to divide the profits from the resale with my wife and I.

13.     The agreement titled "Option to Purchase Real Estate" was prepared by the law firm of Rochelle, McCulloch and Aulds of Lebanon, Tennessee, who represented CRK Real Estate LLC. RMA also arranged interim title insurance.

14.     The term of the Option and profit-sharing time period was two years, which would end on February 17, 2008, and CRK agreed to pay the sum of $660,000 for our property if CRK exercised its option to buy it, or that amount plus "one half of the excess" if it were resold during that time period.

15.     On page 1 of the Option to Purchase Real Estate agreement, item 2, it states in part. "In the event the Buyer sells the Property for more than Six Hundred Sixty Thousand Dollars, the Buyer shall pay to Seller one-half (1/2) the excess, less expenses, at the time of closing of that sale" and there is no further description or formula provided as to the "the excess".

16.     Sometime in July or August CRK agent Marcus French informed my wife and I that CRK would be exercising its purchase option of our property and as a result we purchased another home, financed by F & M Bank and moved into our new home or or around October 6, 2006.

17.     However, CRK did not purchase or pay us for our home in October of 2006 as promised and we had to find a way to make two mortgage payments for the next year and a half.

18.     CRK did not sell or purchase my property for $660,000 under our agreement which ended on February 17, 2008 but instead approached my wife and I and facilitated a sale to an RM Wilson County Investor LLC who bought our property a few days after the Option expired for

$160,000 less than the Option price.

19.       On or around March 12, 2014 Mr. Wilfong provided me a copy of a legal document entitled "Option Agreement and Escrow Instructions" between the parties of CRK Real Estate LLC and RM Wilson County Investor LLC.

20.       CRK did not inform me that it had assigned our Option Agreement to RM Wilson County Investor LLC on September 25, 2006, nor that the parties agreed not to resell CRK's land-holdings for a ten year period of time, as provided for in this "Option Agreement and Escrow Instructions".

21. Again, upon notification by French, we hired a realtor to help find us a new home to purchase and move into. We located a home and purchased it and then moved in on or around October 6, 2006. We obtained a loan from F & M Bank to purchase the new home, which was granted in part by our good standing and by virtue of CRK's promise and the Option Agreement with CRK.

22. When CRK refused to keep their promise our finances became strained because we were then making two mortgage payments as a result. Months later, CRK through French and Kaelin again approached us offering to facilate a sale of their property for $160,000 less than the Option price to a company they referred to as "RM Wilson but they did not disclose that RM and CRK were essentially the same company.

23.       Due to our strained finances, we decided to sell RM Wilson County Investor our property for $160,000 less than the promised Option amount and in doing so CRK also got rid of the profit sharing it might owe us but we did not know all of this until March of 2014.

24.       We were not informed that RM and CRK were controlled, owned and operated by the same person being one Hamid R. Mashhoon.

25.       During the period of time our Option was in force, my wife and I expected CRK to make reasonable efforts in good faith to resell our property at all times, for the full two year period.

26.     Had either CRK or RM disclosed their various agreements, plans or changes of plans we could have considered other options as we were having to make two mortgage payments.

27.     I am not acquainted with CRK and RM Wilson's owner Hamid Mashhoon.

28.     I was not informed of the change of ownership, management or changes of plan of CRK at any time but RM Wilson had knowledge of my Option Agreement and profit-sharing consideration with CRK as it negotiated it into the September 25, 2006 "Option Agreement and Escrow Instructions", of which Mr. Wilfong has provided me a copy that I have attached to this affidavit.

29.     It is my further understanding that a close neighbor, Mr. and Mrs. Robert and Deborah Tuck, also entered into a similar agreement with CRK.

30. I also understand that Mr. Wilfong has a claim filed against CRK as to matters related to profit-sharing and other issues.

31.     Mr. Wilfong asked that I provide an affidavit of my understanding and knowledge of these matters and I have no vested interest of any type in doing so.

32.     Thus ends my affidavit;

_signature_  3-24-14
1702 _Valleywood_ Dr
Mt. Juliet, TN. 37122

Signature, Date and Address

Certificate of Acknowledgment

State of _Tennessee_

County of Wilson

On March 24. 2014 , before me,
Tina M. Guinan ,
  (date)                                      (notary)

personally appeared, James Hamberick ,
                              (signers)
personally known to me, or proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies),and that by
his/her/their signature(s) on the instrument the person(s) or the
entity upon behalf of which the person(s) acted, executed the
instrument


WITNESS my hand and official seal

Tina M Guinan

(notary signature)

My Commission Expires: 3-22.2016


TINA M. GUINAN
STATE
OF
TENNESSEE
NOTARY
PUBLIC
WILSON COUNTY

# AFFIDAVIT OF DENISE HAMBRICK

1. My name is Denise Hambrick and I am above the age of eighteen years and a resident of Wilson County, Tennessee.

2. I affirm that the statements contained in this affidavit are true and accurate to the best of my knowledge and belief and are based solely upon my personal experience and knowledge of the content.

3. I am married to James Hambrick who is employed as the Chief of Police of the City of Mount Juliet, Tennessee and I understand that he is preparing an affidavit also.

4. Sometime in 2012, my husband received a telephone call from a man who identified himself as Jay Wilfong regarding a real estate transaction with CRK Real Estate LLC of a property we formerly owned on Posey Hill Road, east of Mount Juliet.

5. It is my understanding and belief that Wilfong filed a lawsuit against CRK over various issues related to the sale of his land and was trying to figure out some of those details and wanted to know what kind of experiences we had with CRK.

6. Mr. Wilfong asked my husband if he and I would be willing to disclose the details and provide copies of various real estate agreements we entered into with CRK Real Estate LLC in February of 2006 and RM Wilson County Investor LLC, and I have consented to do so, as attested to by this affidavit. (copies of agreements and land sale closing documents attached)

7. Sometime prior to February of 2006, I was approached by a man named Marcus French, on behalf of CRK Real Estate LLC inquiring about our land.

8. I do not recall with certainty if Mr. French mentioned if he was a licensed real estate agent.

9. Mr. French mentioned that CRK was owned by Dr. Charles R. Kaelin.

10.     Mr. French stated in effect that CRK was assembling land parcels to resell as a package located on or around the Beckwith Road/S. Posey Hill/I-40 area.

11.     After discussing possible transactions, which included a profit sharing consideration upon a resale, my wife and I entered into an agreement with CRK on February 18, 2006, which allowed CRK a two year option to purchase our land for $660,000, as well as the right to market the land with their other land and upon a successful resale CRK agreed to divide the profits from the resale with my wife and I.

12.     The agreement titled "Option to Purchase Real Estate" was prepared by the law firm of Rochelle, McCulloch and Aulds of Lebanon, Tennessee, who represented CRK Real Estate LLC. RMA also arranged interim title insurance..

13.     The term of the Option and profit-sharing time period was two years, which would end on February 17, 2008, and CRK agreed to pay the sum of $660,000 for our property if CRK exercised its option to buy it, or that amount plus "one half of the excess" if it were resold during that time period.

14.     On page 1 of the Option to Purchase Real Estate agreement, item 2, it states in part. "In the event the Buyer sells the Property for more than Six Hundred Sixty Thousand Dollars, the Buyer shall pay to Seller one-half (1/2) the excess, less expenses, at the time of closing of that sale" and there is no further description or formula provided as to the "the excess".

15.     The Agreement provided that we could remain in our home for up to one year after CRK might exercise its option to purchase our property.

16.     CRK did not sell or purchase my property for $660,000 under our agreement which ended on February 17, 2008 but instead we agreed to sell for $500,000 three days later.

17.     On or around March 12, 2014 Mr. Wilfong provided me a copy of a legal document entitled "Option Agreement and Escrow Instructions" between the parties of CRK Real Estate LLC and RM Wilson County Investor LLC.

18.     CRK did not inform me that it had assigned our Option Agreement to RM Wilson County Investor LLC on September 25, 2006, nor that the parties agreed not to resell CRK's land-holdings for a ten year period of time, as provided for in this "Option Agreement and Escrow Instructions".

19. Sometime prior to October of 2006, CRK, through its agent Marcus French promised my husband and I that it would exercise its option to purchase our property in October of 2006 but then subsequently failed to do so.

20. Upon notification by French, we hired a realtor to help find us a new home to purchase and move into. We located a home and purchased it and then moved in on or around October 6, 2006. We obtained a loan from F & M Bank to purchase the new home, which was granted in part by our good standing and by virtue of CRK's promise and the Option Agreement with CRK.

21. When CRK refused to keep their promise our finances became strained because we were then making two mortgage payments as a result. A year or so later, CRK through French and Kaelin again approached us offering to facilate a sale of their property for $160,000 less than the Option price to a company they referred to as "RM Wilson but they did not disclose that RM and CRK were essentially the same company.

22.     Due to our strained finances, we decided to sell RM Wilson County Investor our property for $160,000 less than the promised Option amount and in doing so CRK also got rid of the profit sharing it might owe us but we did not know all of this until March of 2014.

23.     CRK's owners and agents did not tell us that RM and CRK were owned and operated by the same person.

24.     During the period of time our Option was in force, my husband and I expected CRK to make good faith efforts to resell our property at all times, for the full two year period.

25.     Had either CRK or RM disclosed their various agreements, plans or changes of plans we could have considered other options as we were having to make two mortgage payments.

26.     I am not acquainted with CRK and RM Wilson's owner Hamid Mashhoon.

27.     I was not informed of the change of ownership, management or changes of plan of CRK at any time but RM Wilson had knowledge of my Option Agreement and profit-sharing consideration with CRK as it negotiated it into the September 25, 2006 "Option Agreement and Escrow Instructions", of which Mr. Wilfong has provided me a copy that I have attached to this affidavit.

28.     It is my further understanding that a close neighbor, Mr. and Mrs. Robert and Deborah Tuck, also entered into a similar agreement with CRK.

29. I also understand that Mr. Wilfong has a claim filed against CRK as to matters related to profit-sharing and other issues.

30.     Mr. Wilfong asked that I provide an affidavit of my understanding and knowledge of these matters and I have no vested interest of any type in doing so.

31.     Thus ends my affidavit;

*Denise Hambrick - 3-24-14     1702- Valley View Dr. Mt. Juliet, TN*

Signature, Date and Address

                    Certificate of Acknowledgment


State of _Tennessee_

County of _Wilson_

On _March 24 2014_, before me,
_Tina M. Guinan_,
        (date)                                                    (notary)

personally appeared, _Denise Hamberick_,
_____
                                              (signers)

personally known to me, or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument

WITNESS my hand and official seal

_Tina M Guinan_

(notary signature)

My Commission Expires: _3.22.2016_

Copy

## OPTION TO PURCHASE REAL ESTATE

THIS OPTION TO PURCHASE REAL ESTATE (the "Agreement") made and entered into as of the 18 day of February, 2006, by and between JAMES HAMBRICK and wife, DENISE HAMBRICK, ("Seller") and CRK REAL ESTATE, LLC, its successors and assigns (the "Buyer").

### WITNESSETH:

1. Option to Purchase. For and in consideration of the sum of Twenty-five Thousand ($25,000.00) Dollars (the "Option Money") which has this day been paid to Seller by Buyer, the receipt and sufficiency of which is hereby acknowledged, Seller hereby grants to Buyer the sole and exclusive option to purchase certain property (the "Option") consisting of that property described in Exhibit A attached hereto and incorporated by reference herein (the "Property"). Upon receipt of the Option Money by Seller, the Option Money shall be fully earned and non-refundable except as specifically provided in Section 3. In the event the Option is exercised, the Option Money shall be applied to the purchase price. Seller has the right to market the Property on its own behalf. In the event the Seller is presented with a legitimate offer in excess of the purchase price set forth below, the Buyer shall have the right (a) to close within thirty (30) days of receipt of the offer at the purchase price set forth below or (b) to terminate this Option. In the event the Seller conveys the Property to someone other than the Buyer, the Option Money shall be refunded to the Buyer.

2. Terms. This option to purchase shall be an exclusive option to purchase for a period of two (2) years from the execution of this Agreement. The purchase price of Six Hundred Sixty Thousand and no/100 ($660,000.00) Dollars shall be paid in cash at closing.

In the event the Buyer sells the Property for more than Six Hundred Sixty Thousand Dollars ($660,000.00), the Buyer shall pay to the Seller one-half (1/2) of the excess, less expenses, at the time of closing of that sale.

3. Title. Buyer shall obtain within ten (10) days from the execution of this Agreement an interim title insurance commitment (the "Commitment") issued by Rochelle, McCulloch and Aulds, PLLC, as Agents for a reputable Title Insurance Company licensed and authorized to do business in the State of Tennessee, as may be acceptable to Buyer (the "Title Commitment"). Buyer shall have ten (10) days after the date of Buyer's receipt of the

1

**Book 7**

Commitment within which to examine the Commitment and to advise Seller of any objections to the title. In turn, Seller shall satisfy all valid objections within a reasonable time not to exceed thirty (30) days after receipt of notice of Buyer's objection (except for liens securing loans to be paid at closing) and, if Seller fails to satisfy the same within such period, then, at the option of Buyer, Buyer shall have the right to close the sale subject to said matters or, in the alternative, this sale may be canceled with all Option Money refunded to Buyer. In this latter event, each of the parties shall thereupon be released from all further liability to the other and the failure of the sale to close shall not constitute an act of default on the part of either Buyer or Seller.

4.  Representation of Seller. Seller represents and warrants to Buyer that:

(i)  To Seller's knowledge, Seller is the owner of all record, legal, and beneficial right, title and interest in and to the Property and the Property will be free, clear and unencumbered at closing (except for encumbrances not objected to by Buyer under Section 3);

(ii)  There are no leases on the Property, and no tenants, occupants, or parties in possession on any portion of the Property other than Seller;

(iii)  Seller has the good and valid right to convey the Property to Buyer without the joinder or approval of any other person or entity whatsoever;

(iv)  Neither the entering into this Agreement nor the consummation of the transaction contemplated herein will cause a violation or breach by Seller of any contracts, agreements, or instruments to which Seller is a party or by which Seller or any of the Property is bound;

(v)  There is no pending condemnation or similar proceeding affecting the Property or any part thereof, and Seller has received no notice that any such proceeding is pending.

(vi)  There is no litigation or proceeding pending, or to Seller's knowledge threatened, against or relating to any of the Property;

(vii)  Except as shown on the Commitment, to Seller's knowledge, there are no title restrictions or laws (other than zoning and building codes and regulations and flood hazard regulations) applicable to the Property, restricting Buyer's intended use of the property;

(viii)  Each of the warranties and representations of Seller is true and correct as of the Effective Date and shall be true and correct as of the closing date.

(ix)  To the best of Seller's knowledge, no pollutants or other toxic or hazardous substances, including any solid, liquid, gaseous or thermal irritant or contaminant, such as smoke, vapor, soot, fumes, alkalis, acids, chemicals or wastes have been stored, discharged, released, generated, or allowed to escape from the Property in violation of applicable environmental laws, no asbestos or asbestos-containing materials are present on the Property in violation of applicable environmental laws, no underground storage tanks are located on the Property or have been removed or filled, no polychlorinated biphenyls ("PCBs") are located on or in the Property in the form of electrical transformers, fluorescent light fixtures with ballasts,

2

**Book 7**

cooling oils, or any other form, and no investigation, administrative order, consent order and agreement, litigation or settlement with respect to any of the foregoing is proposed, threatened, anticipated or in existence with respect to the Property;

5.  Exercise of Option. Buyer may exercise his option to purchase the Property by giving written notice of his election to do so to Seller at the address hereinafter designated. Such notice shall be timely given if deposited in the United States Mail, postage prepaid, on or before the expiration of the two (2) year period set forth above.

6.  Closing. In the event Buyer exercises his option to purchase the Property by giving notice as provided herein, the transaction shall be closed within thirty (30) days following such notice. The closing shall be held in the offices of Rochelle, McCulloch & Aulds, PLLC, Attorneys, 109 Castle Heights Avenue North, Lebanon, Tennessee 37087 at which time all paper legally required to carry out the terms of this Agreement shall be executed and delivered. Upon closing, Seller shall deliver to Buyer a special warranty deed to the Property in a form acceptable to Buyer, with special covenants and warranties, and with the title free and clear of all liens and encumbrances excepting those matters shown in the title commitment and ad valorem or real estate taxes for the year in which the closing occurs, which shall be prorated as of the date of closing. All back taxes and assessments shall be paid by Seller. The Option Money shall be credited toward the purchase price at closing.

Buyer and Seller shall share equally the closing fees in the amount of $100 each and the cost of preparation of this Option in the amount of $150 each. Buyer shall be responsible for the recording costs and transfer taxes in connection with the recording of the deed and any cost required for financing. Seller shall be responsible for the cost of preparation of the deed and the owner's title insurance policy to be issued by Rochelle, McCulloch and Aulds, PLLC.

The Buyer waives the right to receive the Tennessee Residential Property Disclosure Form from the Seller.

7.  Possession. Seller shall have the right to retain possession of the property for a period of one (1) year after the date of closing so long as the Seller maintains insurance on the home and its contents. Seller shall have the right to retain/sell all possessions on the Property and any structures or contents on the Property for a period of one (1) year after the date of closing.

3

Book 7

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 41 of 107 PageID #: 45

8. Risk of Loss. All risk of loss of or to the Property in whole or in part, as a result of any reason, matter, or casualty whatsoever shall remain as a responsibility of Seller until the transfer of legal title to Buyer at closing.

9. Survival. The provisions of this Agreement shall survive the closing of this transaction for a period of one (1) year, at which time such provisions shall lapse and be of no further force or effect.

10. Notices. Any notices required or permitted herein shall be deemed effective upon deposit in the United States mail, postage prepaid, registered or certified mail, return-receipt requested, upon deposit with a nationally recognized overnight courier service, or upon hand delivery, addressed as follows:

As to Seller:

Mr. & Mrs. James Hambrick
705 Posey Hill Road
Mt. Juliet, TN 37122

As to Buyer:

CRK Real Estate, LLC
102 G Hartmann Drive, PNB 194
Lebanon, TN 37087

or to any other address as may be furnished in writing by either party to the other.

11. Enforcement. In the event it shall become necessary for either party to seek legal counsel to enforce any rights or duties granted under this agreement, the prevailing party shall be entitled to recover his reasonable costs and attorneys' fees so incurred from the other party.

12. Commission. Neither the Seller nor the Buyer owes any real estate commission to any real estate broker. Each party hereby indemnifies the other party from any claim for any commission by anyone with whom the other party has dealt.

13. Remedies. In the event of a breach of this Agreement by Buyer after having given notice of his intent to exercise the Option and prior to closing, Seller shall have the right to seek specific performance of this Agreement. In the event of a breach of this Agreement by Seller, Buyer shall be entitled to seek specific performance of this Agreement. The prevailing party in any action commenced due to the breach hereof shall be entitled to recover its costs, expenses and attorney's fees incurred in the enforcement of this Agreement.

14. Assignment. This Agreement may be assigned by Buyer.

4

Book 7

15. **Applicable Law.** This Agreement shall be governed by and construed according to the laws of the State of Tennessee.

16. **Miscellaneous.** This Agreement constitutes the sole and entire agreement between the parties, and no modification hereof shall be binding unless attached hereto and signed by each party to this Agreement. The representations, promises, and inducements included in this Agreement shall be binding upon and inure to each of the parties hereto, their respective heirs, legal representatives, successors and assigns, it being expressly agreed and understood that this Agreement shall be assignable by Buyer with Buyer being released from all liability after such assignment. If the expiration date of any period provided for herein shall fall upon a weekend or holiday, then such expiration date shall be the next business day following the date such period would have otherwise expired.

17. **Time is of the Essence.** Time is of the essence of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the dates written below.

SELLER:

_____
JAMES HAMBRICK

_____
DENISE HAMBRICK

BUYER:

CRK REAL ESTATE, LLC

By: _____
CHARLES R. KAELIN, JR.


STATE OF TENNESSEE )
COUNTY OF WILSON )

Before me, the undersigned, a Notary Public in and for the state and county aforesaid, personally appeared JAMES HAMBRICK and wife, DENISE HAMBRICK, with whom I am personally acquainted, and who, upon oath, acknowledge to me the execution of the foregoing instrument for the purposes therein contained.

WITNESS my hand at office this 18th day of February, 2006.

_____
NOTARY PUBLIC

My Commission Expires:
My Commission Expires: September 18, 2008

5

Book 7

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 43 of 107 PageID #: 47

STATE OF TENNESSEE )
COUNTY OF WILSON )

Personally appeared before me, the undersigned authority, a notary public in and for the
state and county aforesaid, **CHARLES R. KAELIN, JR.**, with whom I am personally
acquainted (or proved to me on the basis of satisfactory evidence), who acknowledged that he is
Chief Manager of **CRK REAL ESTATE, LLC**, the within-named bargainor, and as such
authorized Chief Manager, being given the authority to so do, executed the within instrument on
behalf of the limited liability company by signing its name as such authorized manager.

WITNESS my hand and official seal at office, this _18th_ day of _February_, 2006.

_Rosemarie T. Giles_
NOTARY PUBLIC

My Commission Expires: _7/13/09_

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 44 of 107 PageID #: 48

## EXHIBIT A

Being property lying in the 24th Civil District of Wilson County, Tennessee, and being more particularly described as follows:

**PARCEL 1:**
Being described by survey of John W. Burke, Jr., Registered Land Surveyor, dated 11/14/89 and being described as follows:

Beginning at an iron pin set in the northeast corner of the Jennette property of record in Book 311 at page 247, Register's Office of Wilson County, Tennessee, said property being located in the Carter Subdivision in the 24th Civil District of Wilson County, Tennessee, of record in Book 19, at page 28, Register's Office of Wilson County, Tennessee, and proceeding as follows:

With the right-of-way of North Posey Hill Road North 4 degrees 00 minutes a distance of 150.00' to an iron pin set in the northeast corner; thence leaving the right-of-way and with the east line of the property conveyed to Herman E. Carter, Jr., and wife, Lila Mae Carter, by deed of record in Book 291, at page 252, South 87 degrees 28 minutes West 291.0' to an iron pin set in the northwest corner; thence South 4 degrees 00 minutes West a distance of 150.00' to an iron pin set in the southwest corner; thence North 87 degrees 28 minutes East a distance of 291.00' to the point of beginning and containing 1.0 acres, more or less.

**PARCEL 2:**
Being bounded generally as follows: North by Carter (formerly Meriwether); East by Posey Hill Road; South by Vinegar Hill Road; and West by Ligon.

**PARCEL 3:**
Being bounded generally as follows: On the North by Asa Majors Land; on the East by Public Road; on the South by Alvin Lowe and on the West by R.H. Drury and wife.

Being the same property conveyed to James Hambrick and wife, Denise Hambrick by quitclaim deed from Lila Mae Carter of record in Book _____, Page _____, Register's Office for Wilson County, Tennessee.

**PARCEL 4:**
Land located in the 24th Civil District of Wilson County, Tennessee on the northerly margin of Posey Hill Road, 194.84 feet west of South Posey Hill Road described according to a boundary survey dated 8-27-04 by Campbell, McRae and Associates Surveying, Inc. (John Hood TN R.L.S. # 1838) as follows:

Beginning at an iron rod (old) on the northerly margin of Posey Hill Road, said rod being located N 88 degrees 10' 52" W 194.84 feet from the northwest R.O.W. intersection of said Posey Hill Road and of South Posey Hill Road and being the southwest corner of the Charles H. Jones Land (Book 454, Page 822 R.O.W.C., TN) as shown on a boundary survey of the James R. and Janice Stevenson Land (Plat Book 21, Page 600 R.O.W.C. TN); thence with the northerly margin of said Posey Hill Road N 87 degrees 42' 20" W 442.91 feet to an iron rod (old) at the southeast corner of the Robert W. Tuck Land (Book 800, Page 1844 R.O.W.C., TN) thence leaving said northerly margin with said tuck N 04 degrees 04' 46" E 526.10 feet to an iron rod (new); thence leaving said tuck and severing the land described in Book 457, Page 736, R.O.W.C., TN, (parent tract to the herein described land) S 85 degrees 55" 14" E 344.32 feet to an iron rod (new) in the westerly line of the Michael W. Carter Land (Book 418, Page 872 R.O.W.C., TN) as shown in a plat entitled Carter Subdivision recorded in Plat Book 19, Page 28, R.O.W.C., TN.; thence with said Carter S 03 degrees 14' 47" W 118.64 feet to an iron rod (old) at said Carter's southwest corner; thence N 86 degrees 42' 47" E

7

92.19 feet to an iron rod (old) at said Jones's northwest corner; thence with said Jones S 03 degrees 21' 55" W 265.91 feet to an iron rod (old); thence S 03 degrees 17' 51" W 139.62 feet to the point of beginning containing 5.00 acres more or less.

Being the same property conveyed to James Hambrick by quitclaim deed from Lila Carter of record in Book 1074, Page 38, said Register's Office for Wilson County, Tennessee.

8

**Book 7**

# REAL PROPERTY PURCHASE AGREEMENT

THIS AGREEMENT ("**Agreement**") is made as of February 20, 2008 (the "**Effective Date**"), by and between James Hambrick and Denise Hambrick, husband and wife (collectively "**Seller**"), and RM Wilson County Investor, LLC, a California limited liability company ("**Buyer**").

## RECITALS

Seller desires to sell all of Seller's right, title and interest in and to certain real property, located in Wilson County, State of Tennessee, along with certain related personal and intangible property owned by Seller, and Buyer desires to purchase such real, personal and intangible property

NOW, THEREFORE, in consideration of the respective promises contained in this Agreement, Buyer and Seller agree as follows:

1.     **PURCHASE AND SALE**

Subject to the terms and conditions of this Agreement, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the following (collectively, the "Property"):

A.     That real property located in the County of Wilson, State of Tennessee, as more particularly described in Exhibit "A", together with, all and singular, the tenements, hereditaments, easements, rights of way and appurtenances belonging or in anywise appertaining to the same (collectively, the "**Land**");

B.     All improvements, structures and fixtures now or on the "**Closing Date**" (as defined below) located upon the Land (the "**Improvements**");

C.     All tangible personal property now or on the Closing Date located on or about the Land or Improvements or attached or appurtenant thereto or used in connection with the operation thereof that is not otherwise retained or sold by Seller prior to the time Seller surrenders the Property to Buyer pursuant to Section 11 (the "**Personal Property**"); and

D.     All intangible property now or on the Closing Date owned or held in connection with the Land, the Improvements or the Personal Property, or any business or businesses now or hereafter conducted thereon or with the use thereof including all leases, contract rights and agreements (other than those Business Agreements required to be terminated pursuant to this Agreement), warranties (including those relating to the construction or fabrication), utility contracts, plans and specifications, governmental approvals and development rights, related to the Land, the Improvements or the Personal Property or any part thereof (the "**Intangible Property**").

SV 346,261,144v2

## 2. PURCHASE PRICE

The purchase price ("**Purchase Price**") for the Property shall be Five Hundred Thousand Dollars ($500,000).

## 3. PAYMENT OF PURCHASE PRICE

The Purchase Price shall be paid to Seller by Buyer as follows:

### A. DEPOSIT

Prior to the expiration of the "Due Diligence Period" (as defined below), if Buyer determines, in its sole and absolute discretion, that it desires to proceed with this transaction, Buyer shall deliver to First American Title Insurance Company ("**Title Company**"), at its address indicated in Section 11D, a cashier's check or wire transfer of immediately available federal funds, in the amount of Five Thousand Dollars ($5,000), which amount, together with the interest earned on such amount while in Title Company's possession, is referred to in this Agreement as the "**Deposit**". The Deposit shall be invested in an interest-bearing account at a mutually acceptable banking institution. Any interest earned on the Deposit shall be considered as part of the Deposit and shall be deemed income to Buyer unless and until the Deposit is released to Seller pursuant to the terms hereof. Except as otherwise provided in this Agreement, the Deposit will be applied to the Purchase Price at Closing. If Buyer does not make the Deposit for any reason prior to the expiration of the Due Diligence Period, then this Agreement shall terminate and the parties shall have no further liability or obligation hereunder.

### B. CLOSING PAYMENT

The balance of the Purchase Price, as adjusted by the prorations and credits specified in this Agreement, shall be paid by wire transfer of immediately available federal funds on the date ("**Closing Date**") that is fourteen (14) days after the expiration of the Due Diligence Period; which Closing Date is subject to extension pursuant to Section 4 and Section 10(B)(3). The amount to be paid under this subsection B is referred to in this Agreement as the "**Closing Payment**".

### C. LIQUIDATED DAMAGES; DISPOSITION OF DEPOSIT

IF THE CLOSING DOES NOT OCCUR DUE TO BUYER'S DEFAULT UNDER THIS AGREEMENT (ALL CONDITIONS TO BUYER'S OBLIGATIONS HAVING BEEN SATISFIED OR WAIVED), IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER. THEREFORE, THE PARTIES HAVE AGREED THAT A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER IN SUCH EVENT IS AND SHALL BE THE RIGHT TO RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES, AS SELLER'S SOLE AND EXCLUSIVE REMEDY UNDER THIS AGREEMENT. SUCH LIQUIDATED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF APPLICABLE LAWS. IF THE CLOSING DOES NOT OCCUR FOR ANY REASON OTHER THAN BUYER'S DEFAULT UNDER THIS AGREEMENT, THEN THE DEPOSIT SHALL BE

SV 346,261,144v2

RETURNED IMMEDIATELY TO BUYER (WITHOUT LIMITATION ON AND IN ADDITION TO ANY OTHER RIGHTS OR REMEDIES OF BUYER). IF THE CLOSING OCCURS IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, THE DEPOSIT SHALL BE APPLIED AS A CREDIT TOWARD THE PURCHASE PRICE.

_____          _____
BUYER'S INITIALS                 SELLER'S INITIALS

### D. DISCHARGE OF EXISTING LIENS

Seller shall cause all mortgages, deeds of trust and monetary liens (including liens for delinquent taxes, mechanics' liens and judgment liens) affecting the Property and all indebtedness secured thereby (the "**Existing Liens**") to be fully satisfied, released and discharged of record on or prior to the Closing Date so that Buyer shall take title to the Property free of the same. Seller acknowledges that such satisfaction, release and discharge may involve substantial prepayment penalties or premiums and other costs or expenses, all of which shall be paid by Seller at its sole cost and expense prior to the Closing Date.

### 4. TITLE

### A. TITLE COMMITMENT AND SURVEY

Seller shall deliver to Buyer a title commitment covering the Property from Title Company and legible copies of the documents evidencing the exceptions to title stated therein (collectively, the "**Commitment**"). Buyer shall obtain at its cost an ALTA/ACSM land survey of the Property (the "**Survey**"). Buyer shall have until five (5) days prior to the expiration of the Due Diligence Period (the "**Title Approval Date**") to provide written notice to Seller of any matters ("**Title Objections**") shown on the Commitment or Survey (and any updates thereof) which are not satisfactory to Buyer, which notice ("**Title Notice**") must specify the reason such matter(s) are not satisfactory and the curative steps necessary to remove the basis for Buyer's disapproval. Seller may elect (but shall not be obligated) to remove or cause to be removed, or insured over, at its expense, any Title Objections, and shall be entitled to a reasonable adjournment of the Closing for the purpose of such removal, which removal will be deemed effected by the issuance of title insurance eliminating or insuring against the effect of the Title Objections. Seller shall notify Buyer in writing within three (3) days after receipt of the Title Notice whether and to the extent Seller elects to remove the same ("**Seller's Response**"). If Seller elects in Seller's Response not to remove one or more Title Objections, Buyer may elect to either (a) terminate this Agreement by giving written notice to Seller and Title Company on or before the expiration of the Due Diligence Period in which event the Deposit shall be paid to Buyer and, thereafter, the parties shall have no further rights or obligations hereunder except for those obligations which expressly survive the termination of this Agreement, or (b) waive such Title Objections, in which event such Title Objections shall be deemed additional "Permitted Exceptions". If Buyer fails to give Seller and Title Company such written notice prior to the expiration of the Due Diligence Period then Buyer shall be deemed to have elected to terminate this Agreement pursuant to this Section.

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 49 of 107 PageID # 53

In the event that any exception or matter affecting title to the Property which was not originally disclosed in the Commitment or Survey and was not caused, created or consented to by Buyer or Buyer's Representatives (a "**New Title Matter**") is disclosed on any update of the Commitment or Survey or otherwise becomes known to Buyer, then the parties shall implement the procedure set forth in the preceding paragraph with respect to such New Title Matter (and if necessary, the Closing Date shall be extended to allow for such procedure), except that solely for purposes of implementing such procedure with respect to such New Title Matter (and for no other purpose under this Agreement), the "Title Approval Date" shall mean two (2) business days after the date that Buyer first received written notice and a full copy of such New Title Matter from the Title Company or the applicable surveyor.

## B.    TITLE CONTINGENCY

A condition precedent to Buyer's obligation to purchase the Property shall be the willingness of Title Company to issue to Buyer on the Closing Date an ALTA Form B (2006) extended coverage owner's title insurance policy ("**Owner's Policy**"), or equivalent form acceptable to Buyer, in the face amount of the Purchase Price and dated as of the date the Deed is recorded, indicating title to the Property to be vested of record in Buyer, subject solely to the "Permitted Exceptions" (as defined below), and containing such endorsements reasonably required by Buyer, including, without limitation, endorsements deleting exceptions or exclusions for arbitration and creditors' rights.  As used herein, "**Permitted Exceptions**" means the following:  (1) the lien of any real estate taxes and assessments for the "Current Tax Year" (as defined below) and subsequent periods, *provided* that the same are prorated in accordance with this Agreement; and (2) such other matters set forth in the Commitment or Survey which are approved or deemed approved by Buyer during the Due Diligence Period.

## 5.    DUE DILIGENCE CONTINGENCY

Seller shall provide Buyer and its agents and representatives with access to the Property hereunder and will provide access to all relevant information respecting the Property, to the extent such information is in the possession or control of Seller.  Without limitation on the foregoing, on or before the Effective Date, Seller shall deliver to Buyer at its address set forth in Section 12D copies of the items and information described in Exhibit "B" (collectively, the "**Due Diligence Package**"), to the extent such items are in Seller's possession or control. Commencing on the Effective Date and continuing until 5:00 p.m. Central Standard Time on the day that is thirty (30) days from the Effective Date (as the same may be extended pursuant to this Section 5, the "**Due Diligence Period**"), Buyer shall have the opportunity to perform and complete, at its sole expense, its due diligence review, examination and inspection of all matters pertaining to its acquisition of the Property, including the Intangible Property, and all financial, physical, environmental and compliance matters, entitlements and other conditions respecting the Property. Buyer shall at all times conduct such due diligence in compliance with "Laws" (as defined below), and in a manner so as to not cause damage, loss, cost or expense to Seller, the Property, and Buyer shall promptly restore the Property to its condition immediately preceding such inspections and examinations and shall keep the Property free and clear of any mechanic's liens or materialmen's liens in connection with such inspections and investigations.   Any intrusive physical testing (environmental, structural or otherwise) at the Property (such as soil borings or the like) shall be conducted by Buyer only after obtaining Seller's prior written

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 50 of 107 PageID #: 54

consent to such testing, which consent shall not be unreasonably withheld. Buyer shall indemnify, protect, defend and hold Seller harmless from and against any "Claim" (as defined below) for property damage or personal injury arising from Buyer's negligence or willful misconduct in connection with its inspections or examinations of the Property.

### 6. CLOSING

The closing ("**Closing**") of the sale and purchase herein provided shall be consummated through the mail with all deliveries required hereunder being made to Title Company on or before 2:00 p.m. Central Standard Time on the Closing Date.

#### A. ESCROW

On or before 2:00 p.m. Central Standard Time on the Closing Date, the parties shall deliver to Title Company the following:

##### (1) By Seller

Seller shall deliver (a) duly executed and acknowledged original special warranty deed covering the Land and Improvements, in the form of Exhibit "C" (the "**Deed**"); (b) four (4) duly executed and acknowledged counterpart originals of the bill of sale, assignment and assumption covering the Personal Property and Intangible Property, in the form of Exhibit "D" ("**Bill of Sale, Assignment and Assumption**"); (c) evidence reasonably satisfactory to Title Company that all necessary authorizations of the transaction provided herein have been obtained by Seller, such other documents and instruments, payments, indemnities, releases and agreements (including a gap undertaking and owner's affidavit) and shall perform such other acts as Title Company shall reasonably require in order to issue the Owner's Policy, and such other instruments as may be reasonably requested by Title Company in order to consummate the transaction contemplated hereby and issue the Owner's Policy; (d) releases ("**Releases**") of the Existing Liens satisfactory to Buyer and Title Company; and (e) to the extent not previously delivered to Buyer and within the possession or control of Seller or its affiliates, originals of all items within the Due Diligence Package (including originals of all "Permits" [as defined below]). Seller shall not take any action or omit to take any action, which action or omission would result in any such exception.

##### (2) By Buyer

Buyer shall deliver (a) the Closing Payment by wire transfer of immediately available federal funds; (b) four (4) duly executed and acknowledged counterpart originals of the Bill of Sale, Assignment and Assumption; and (c) evidence reasonably satisfactory to Title Company that all necessary authorizations of the transaction provided herein have been obtained by Buyer, and such other documents and instruments as may be reasonably requested by Title Company in order to consummate the transaction contemplated hereby and issue the Owner's Policy.

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 51 of 107   PageID #: 55

B.  **CONDITIONS TO CLOSING; DELIVERY TO PARTIES**

The conditions to the closing of such escrow shall be Title Company's receipt of funds and documents described in subsection A above. Upon the satisfaction of the above conditions, then Title Company shall deliver the items described in subsection A above in accordance with the respective escrow instructions of Buyer and Seller.

C.  **CLOSING COSTS**

Buyer shall pay (1) 50% of all costs and expenses of the escrow arrangements; (2) 50% of all documentary transfer taxes payable in connection with the recordation of the Deed; (3) the premium applicable to the extended coverage portion of the Owner's Policy and 100% of the cost of all endorsements to the Owner's Policy, and (4) the cost of any of its examinations and inspections and audits of the Property, including the cost of any of its appraisals, environmental, physical and financial audits, and, if applicable, all costs associated with any financing to be obtained by Buyer. Seller shall pay (a) the premium applicable to the standard coverage portion of the Owner's Policy; (b) 50% of all costs and expenses of the escrow arrangements; (c) 50% of all documentary transfer taxes payable in connection with the recordation of the Deed; and (d) the recording fees for the Deed, the Releases or the release of other matters not constituting Permitted Exceptions, and any other documents contemplated by this Agreement. All other closing costs not specifically allocated herein shall be paid by the parties as is customary in the county in which the Property is located. Seller and Buyer shall each pay their respective (i) legal fees and expenses, (ii) share of prorations (as provided below), and (iii) cost of all opinions, certificates, instruments, documents and papers required to be delivered, or caused to be delivered, by it hereunder and the cost of all its performances under this Agreement.

D.  **PRORATIONS**

(1)  **Items to be Prorated**

All real estate taxes and assessments on the Property payable in respect to the current fiscal year of the applicable taxing authority in which the Closing Date occurs (the "**Current Tax Year**") shall be prorated between Seller and Buyer as of the Closing Date. Such real estate taxes and assessments shall be prorated on a per diem basis based upon the number of days in the Current Tax Year prior to the Closing Date (which shall be allocated to Seller) and the number of days in the Current Tax Year on and after the Closing Date (which shall be allocated to Buyer). Seller shall be responsible for real estate taxes and assessments (including any "rollback taxes" assessed by the applicable taxing authority in connection with any changed use of the Property) on the Property payable in respect to periods prior to the Current Tax Year. Upon the Closing Date and subject to the adjustment provided for above, Buyer shall be responsible for real estate taxes and assessments on the Property payable in respect to the Current Tax Year and all periods after the Current Tax Year.

(2)  **Calculation**

The prorations and payments shall be made on the basis of a written statement submitted by Title Company to Buyer and Seller prior to the Closing Date and

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 52 of 107 PageID #: 56

approved by Buyer and Seller. In the event any prorations or apportionments made under this subsection D shall prove to be incorrect for any reason, then any party shall be entitled to an adjustment to correct the same. Any item which cannot be finally prorated because of the unavailability of information shall be tentatively prorated on the basis of the best data then available and re-prorated when the information is available. Notwithstanding the foregoing, any re-proration shall be made, if at all, within 30 days after the information necessary to perform such re-proration is available.

### (3) Items Not Prorated

Seller and Buyer agree that (a) none of the insurance policies relating to the Property will be assigned to Buyer (and Seller shall pay any cancellation fees resulting from the termination of such policies) and Buyer shall responsible for arranging for its own insurance as of the Closing Date; (b) utilities, including telephone, electricity, water and gas, shall be read on the Closing Date to the extent reasonably feasible; (c) the Property will not be subject to any Existing Liens; and (d) all employees of Seller performing services at the Property shall be terminated by Seller prior to the Closing Date and Seller shall fully pay such employees prior to the Closing Date all accrued salaries, wages and benefits (including vacation and sick pay), and Buyer shall not be obligated to rehire such employees. Accordingly, there will be no prorations for insurance, utilities, debt service or payroll. Notwithstanding the foregoing, in the event a meter reading is unavailable for any particular utility, such utility shall be prorated within 30 days after the information necessary to perform such proration is available.

## 7. CONDEMNATION OF PROPERTY

In the event that all or any portion of the Land or Improvements is the subject of a taking or condemnation under the provisions of eminent domain law after the Effective Date but prior to the Closing Date, Seller shall assign to Buyer at closing its rights to any condemnation proceeds resulting from such taking; provided, however that Buyer shall have the right to terminate this Agreement by written notice to Seller given on or before the Closing Date and the parties shall have no further liability or obligation hereunder, except for any liabilities or obligations that are intended to survive the termination of this Agreement.

## 8. REPRESENTATIONS AND WARRANTIES; CERTAIN COVENANTS

### A. REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants the following to Buyer:

### (1) Enforceability

Each party comprising Seller has legal capacity to execute this Agreement and all agreements, instrument and documents herein provided to be executed or caused to be executed, and this Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Seller are binding upon each party comprising Seller.

(2)     **No Bankruptcy**

No party that comprises Seller has filed for bankruptcy protection.

(3)     **Improvements**

To the best knowledge of Seller, the Improvements have been constructed in a good, workmanlike manner in accordance with all "Laws", "Permits" and "Business Agreements" (each as defined below), and are free from any material defects.

(4)     **Compliance**

To the best knowledge of Seller: (a) all Permits have been obtained, are in full force and effect and are free from violation; and (b) the Property and the operation and use thereof complies with applicable Laws and the Business Agreements.

(5)     **Personal Property**

Seller holds good title to, and the entire right, title, and interest in and to, the Personal Property, free and clear of any and all leases, liens, encumbrances, or other liabilities, except the Permitted Exceptions.

(6)     **Due Diligence Package**

The Due Diligence Package is true and correct in all material respects (and without limitation, Seller has delivered to Buyer true, correct and complete copies of each Permitted Exception, and all other material information respecting the Property within its possession or control).

(7)     **Litigation; Condemnation**

There are no actions, suits or proceedings pending or, to the best knowledge of Seller, threatened, before or by any judicial, administrative or union body, any arbiter or any governmental authority, against or affecting Seller or the Property (or any portion thereof). There is no existing, proposed or contemplated eminent domain or similar proceeding which would affect the Land or Improvements in any way whatsoever.

(8)     **Soils Conditions**

To the best knowledge of Seller, there are no soil conditions adversely affecting the Property.

(9)     **Hazardous Materials**

To the best knowledge of Seller, there are (and have been) no "Hazardous Materials" (as defined below) installed or stored in or otherwise existing at, on, in or under the Property.

SV 346,261,144v2

### (10) Notices; Requests

Seller has received no notice and has no knowledge that any government agency or any employee or official thereof considers the construction of the Property or the operation or use of the same to have failed to comply with any Law, or that any investigation has been commenced or is contemplated respecting any such possible failure of compliance. There are no unsatisfied requests for repairs, restorations or improvements from any person, entity or authority, including, but not limited to, any tenant, lender, insurance carrier or government authority.

### (11) Existing Agreements

There are no agreements or understandings (whether written or oral) relating to the Property, except for the Permitted Exceptions and as otherwise disclosed in the Due Diligence Package. No amendments or waivers pertaining to the foregoing will be made prior to the Closing Date.

### (12) Adverse Information

Seller has no information or knowledge of any change contemplated in any applicable laws, ordinances or restrictions, or any judicial or administrative action, or any action by adjacent landowners, or natural or artificial conditions upon the Property, or any other fact, circumstance or condition, financial or otherwise, which would prevent, limit, impede or render more costly Buyer's contemplated use of the Property.

## B. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants the following to Seller:

### (1) Formation; Authority

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of California and duly authorized and qualified to do all things required of it under this Agreement. Buyer has all requisite limited liability company power and authority to execute and deliver, and to perform all of its obligations under, this Agreement and nothing prohibits or restricts the right or ability of Buyer to close the transactions contemplated hereunder and carry out the terms hereof.

### (2) Due Execution; Enforceability

This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Buyer are duly authorized, executed and delivered by and are binding upon Buyer.

### (3) No Bankruptcy/Dissolution Event.

Buyer is not the subject of a Bankruptcy/Dissolution Event.

SV 346,261,144v2

JAH 2-20-08   19:4(
C.D.H 2-20-08   19:5

## C. CERTAIN INTERIM COVENANTS OF SELLER

Until the Closing Date or the sooner termination of this Agreement:

(1) Seller shall not enter into any additional Business Agreements affecting the Property without the prior consent of Buyer. To the extent directed by Buyer in its sole and absolute discretion, Seller, at its sole cost and expense, shall terminate as of the Closing Date any Business Agreements affecting the Property.

(2) Seller shall maintain its existing insurance policies for the Property through the Closing Date.

## 9. INDEMNIFICATION OBLIGATIONS

If the Closing occurs, then the parties shall have the following respective indemnification obligations:

### A. INDEMNIFICATION BY SELLER

Seller shall protect, defend, indemnify and hold Buyer and the Property harmless from and against: (a) any Claim in any way related to the Property and arising or accruing prior to Closing Date, including any Claim arising or accruing under any Permitted Exception or other Business Agreement arising prior to the Closing Date; (b) any Claim in any way related to Seller's continued occupation of the Property on or after the Closing Date; (c) any Claim that results from any breach or default by Seller under this Agreement, and (d) the recapture of any "rollback taxes" by any applicable taxing authority for any period preceding the Closing Date, to the extent such rollback taxes are assessed by such applicable taxing authority in connection with the change of use of the Property. It is understood that the liability of each Seller for indemnification under this Agreement is joint and several, which shall be applied on an aggregate basis against the parties constituting Seller.

### B. INDEMNIFICATION BY BUYER

Buyer shall protect, defend, indemnify and hold Seller harmless from and against: (a) any Claim in any way related to the Property and first arising or accruing on or after the Closing Date, including any Claim first arising or accruing on or after the Closing Date under any Permitted Exception assumed by Buyer (except to the extent such Claim results from a fact or circumstance that is inconsistent with the representations and warranties of Seller in connection with this Agreement or any document executed by Seller pursuant to this Agreement, or constitutes or results from a breach by Seller or a matter which is the responsibility of Seller under this Agreement or any document executed by Seller pursuant to this Agreement); and (b) any Claim that results from any breach or default by Buyer under this Agreement.

### C. GENERALLY

The indemnification obligations under this Agreement shall be subject to the following provisions:

SV 346,261,144v2

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 56 of 107 PageID #: 60

(1)     The party seeking indemnification ("**Indemnitee**") shall notify the other party ("**Indemnitor**") of any Claim against Indemnitee within fifteen (15) days after it has notice of such Claim, but failure to notify Indemnitor shall in no case prejudice the rights of Indemnitee under this Agreement unless Indemnitor shall be prejudiced by such failure and then only to the extent of such prejudice. Should Indemnitor fail to discharge or undertake to defend Indemnitee against such liability (with counsel approved by Indemnitee), within ten (10) days after Indemnitee gives Indemnitor written notice of the same, then Indemnitee may settle such Claim, and Indemnitor's liability  to Indemnitee shall be conclusively established by such settlement, the amount of such liability to include both the settlement consideration and the reasonable costs and expenses, including attorneys' fees, incurred by Indemnitee in effecting such settlement. Indemnitee shall have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of Indemnitee unless:  (a) the employment of such counsel shall have been authorized in writing by Indemnitor in connection with the defense of such action, (b) Indemnitor shall not have employed counsel to direct the defense of such action, or (c) Indemnitee shall have reasonably concluded that there may be defenses available to it which are different from or additional to those available to Indemnitor (in which case Indemnitor shall not have the right to direct the defense of such action or of Indemnitee), in any of which events such fees and expenses shall be borne by Indemnitor.

(2)     The indemnification obligations under this Agreement shall also extend to any present or future advisor, trustee, director, officer, partner, member, employee, beneficiary, shareholder, participant or agent of or in Indemnitee or any entity now or hereafter having a direct or indirect ownership interest in Indemnitee.

## 10.   CONDITIONS TO CLOSING

### A.   SELLER'S CONDITIONS TO CLOSING

In addition to the conditions provided in other provisions of this Agreement, Seller's obligations to perform its undertakings provided in this Agreement (including its obligation to sell the Property) are conditioned on the following:

(1)     **Performance by Buyer**

The due performance by Buyer of each and every undertaking and agreement to be performed by it hereunder in all material respects (including the delivery to Seller of the items specified to be delivered by Buyer in Section 6 hereof) and the truth of each representation and warranty made by Buyer in this Agreement in all material respects at the time as of which the same is made and as of the Closing Date as if made on and as of the Closing Date.

(2)     **No Bankruptcy or Dissolution**

That at no time on or before the Closing Date shall any Bankruptcy/Dissolution Event have occurred with respect to Buyer.

2-20-08
2-20-08

19:4(
19:5

### B. BUYER'S CONDITIONS TO CLOSING

In addition to the conditions provided in other provisions of this Agreement, Buyer's obligations to perform its undertakings provided in this Agreement (including its obligation to purchase the Property) are conditioned on the following:

#### (1) Performance by Seller

The due performance by Seller of each and every undertaking and agreement to be performed by it hereunder in all material respects (including the delivery to Buyer of the items specified to be delivered by Seller in Section 6), and the truth of each representation and warranty made by Buyer in this Agreement in all material respects at the time as of which the same is made and as of the Closing Date as if made on and as of the Closing Date. Without limitation on the foregoing, there shall be no defaults or exceptions noted in the Closing Certificate.

#### (2) No Bankruptcy

That at no time on or before the Closing Date shall a party comprising Seller have filed for bankruptcy protection.

#### (3) Approval of Development Due Diligence.

Prior to the expiration of the Due Diligence Period, Buyer shall have notified Seller in writing that Buyer is satisfied, in its sole and absolute discretion, with the results of the investigations of the engineers, consultants and other professionals retained by Buyer in connection with the acquisition of the Property, as such investigations pertain to Buyer's intended development of the Property.

## 11. POST-CLOSING OCCUPATION

### A. OCCUPATION.

Provided that the Closing is consummated and effective as of the Closing Date, Buyer hereby grants Seller, for no additional consideration, a license to occupy the Property for the period commencing on the Closing Date and expiring on the one (1) year anniversary thereof. Seller shall be required to maintain insurance on the Property (including the residential structure and all fixtures and personal property located thereon), with such limits and through such insurance company as reasonably acceptable to Buyer. Seller shall cause Buyer to be named as an additional insured on any applicable insurance policy, and, if requested by Buyer, shall deliver a certificate of insurance to Buyer within fifteen (15) days of Buyer's request. If requested by Buyer, Seller and Buyer shall enter into a license agreement further commemorating the terms of the foregoing license, in such form to be mutually acceptable to the parties.

### B. PERSONAL PROPERTY.

Notwithstanding anything to the contrary contained herein, at the expiration of the

one year period set forth in Section 11(A), Seller shall be entitled to retain ownership of and remove any personal property located in the residential structure, which personal property shall be excluded from the Personal Property sold to buyer hereunder. Any personal property which is not removed from the Property following the expiration of the one year period shall be deemed to be surrendered to Buyer.

## 12.   MISCELLANEOUS

### A.   BROKERAGE ISSUES

Seller represents and warrants to Buyer, and Buyer represents and warrants to Seller, that no broker or finder has been engaged by it, respectively, in connection with any of the transactions contemplated by this Agreement or to its knowledge is in any way connected with any of such transactions. In the event of a Claim for broker's or finder's fee or commissions in connection herewith, then Seller shall indemnify, protect, defend and hold Buyer harmless from and against the same if it shall be based upon any statement or agreement alleged to have been made by Seller, and Buyer shall indemnify, protect, defend and hold Seller harmless from and against the same if it shall be based upon any statement or agreement alleged to have been made by Buyer.

### B.   LIMITATION OF LIABILITY

No present or future partner, member, director, officer, shareholder, employee, advisor, affiliate or agent of or in Buyer or any affiliate of Buyer shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Seller and its successors and assigns and, without limitation, all other persons and entities, shall look solely to Buyer's assets for the payment of any Claim or for any performance, and Seller hereby waives any and all such personal liability. For purposes of this subsection B, no negative capital account or any contribution or payment obligation of any partner or member in Buyer shall constitute an asset of Buyer. In addition, neither Buyer nor any successor or assign of Buyer intends to assume any personal liability, directly or indirectly, under or in connection with any Business Agreement to which the Property is now or hereafter subject, and no such assumption shall be implied except to the extent expressly set forth in the Bill of Sale, Assignment and Assumption. The limitations of liability contained in this Section are in addition to, and not in limitation of, any limitation on liability applicable to Buyer provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument.

### C.   SUCCESSORS AND ASSIGNS

Seller may not assign or transfer its rights or obligations under this Agreement without the prior written consent of Buyer (in which event such transferee shall assume in writing all of the transferor's obligations hereunder, but such transferor shall not be released from its obligations hereunder). No consent given by Buyer to any transfer or assignment of Seller's rights or obligations hereunder shall be construed as a consent to any other transfer or assignment of Seller's rights or obligations hereunder. Buyer may not assign or transfer its rights

SV 346,261,144v2

2-20-08
2-20-08

19:48
19:5

or obligations under this Agreement prior to the Closing Date without the prior written consent of Seller (which Seller agrees not to unreasonably withhold), except to an affiliate of Buyer or an entity sponsored by or advised by Buyer or an affiliate of Buyer. No transfer or assignment in violation of the provisions hereof shall be valid or enforceable. Subject to the foregoing, this Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the parties. In the event the rights and obligations of Buyer shall be transferred and assigned as permitted under this Agreement, then such assignor shall be released from any obligation or liability hereunder, and such transferee and assignee ("**Assignee**") will be substituted in place of such assignor in the above provided for documents and it shall be entitled to the benefit of and may enforce Seller's covenants, representations and warranties hereunder. Upon any such assignment by Buyer or any successor or assign of Buyer, then the assignor's liabilities and obligations hereunder or under any instruments, documents or agreements made pursuant hereto shall be binding upon Assignee; *provided, however,* that Assignee shall have the benefit of any limitations of such liabilities and obligations applicable to either the assignor or Assignee, provided by law or by the terms hereof or such instruments, documents or agreements.

   D.   NOTICES

   Any notice which a party is required or may desire to give the other shall be in writing and shall be sent by personal delivery or by mail (either [i] by United States registered or certified mail, return receipt requested, postage prepaid, or [ii] by Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery); addressed as follows (subject to the right of a party to designate a different address for itself by notice similarly given at least five (5) days in advance):

   To Buyer:

   RM Wilson County Investor, LLC
   4525 District Blvd.
   Vernon, CA 90058
   Facsimile: (323) 583-0517

   With Copy To:

   Greenberg Traurig
   2450 Colorado Avenue, Suite 400E
   Santa Monica, CA 90404
   Attention: Carol Perrin
   Telephone: (310) 586-7705
   Facsimile: (310) 586-7800

   To Seller:

   James and Denise Hambrick
   705 Posey Hill Road
   Mt. Juliet, TN 37122
   Telephone: _____
   Facsimile: _____

SV 346,261,144v2

To Title Company:

First American Title Insurance Company
National Commercial Services
315 Deaderick Street, Suite 2055
Nashville, Tennessee 37238
Attention: Susan H. Felts
Telephone: (615) 256.6601
Facsimile: (615) 256.6604

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be. Any such notice not so given shall be deemed given upon actual receipt of the same by the party to whom the same is to be given. Notices may be given by facsimile transmission and shall be deemed given upon the actual receipt of the same by the individual to which they are addressed, and shall be promptly followed by a hard copy notice by mail as provided above.

### E. LEGAL COSTS

In the event any action be instituted by a party to enforce this Agreement, the prevailing party in such action (as determined by the court, agency or other authority before which such suit or proceeding is commenced), shall be entitled to such reasonable attorneys' fees, costs and expenses as may be fixed by the decision maker. The foregoing includes, but is not limited to, reasonable attorneys' fees, expenses and costs of investigation incurred in (1) appellate proceedings; (2) in any post-judgment proceedings to collect or enforce the judgment; (3) establishing the right to indemnification; and (4) any action or participation in, or in connection with, any case or proceeding under Chapter 7, 11 or 13 of the Bankruptcy Code (11 United States Code Sections 101 *et seq.*), or any successor statutes.

### F. FURTHER INSTRUMENTS

Each party will, whenever and as often as it shall be requested so to do by the other, cause to be executed, acknowledged or delivered any and all such further instruments and documents as may be necessary or proper, in the reasonable opinion of the requesting party, in order to carry out the intent and purpose of this Agreement.

### G. MATTERS OF CONSTRUCTION

#### (1) Incorporation of Exhibits

All exhibits attached and referred to in this Agreement are hereby incorporated herein as fully set forth in (and shall be deemed to be a part of) this Agreement.

#### (2) Entire Agreement

This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes all prior agreements between the parties

- 15 -

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 61 of 107 PageID #: 65

hereto respecting such matters, including, without limitation, that certain Option To Purchase Real Estate dated February 18, 2006, between Seller and CRK Real Estate, LLC, an affiliate of Buyer.

(3)    **Time of the Essence**

Subject to subsection (4) below, time is of the essence of this Agreement.

(4)    **Non Business Days**

Whenever action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time (or by a particular date) that ends (or occurs) on a non business day, then such period (or date) shall be extended until the immediately following business day. As used herein, **"business day"** means any day other than a Saturday, Sunday or federal or Tennessee holiday.

(5)    **Severability**

If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

(6)    **Interpretation**

Words used in the singular shall include the plural, and vice versa, and any gender shall be deemed to include the other. Whenever the words "including", "include" or "includes" are used in this Agreement, they should be interpreted in a non-exclusive manner. The captions and headings of the Sections of this Agreement are for convenience of reference only, and shall not be deemed to define or limit the provisions hereof. Except as otherwise indicated, all Exhibit and Section references in this Agreement shall be deemed to refer to the Exhibits and Sections in this Agreement. Each party acknowledges and agrees that this Agreement (a) has been reviewed by it and its counsel; (b) is the product of negotiations between the parties, and (c) shall not be deemed prepared or drafted by any one party. In the event of any dispute between the parties concerning this Agreement, the parties agree that any ambiguity in the language of the Agreement is to not to be resolved against Seller or Buyer, but shall be given a reasonable interpretation in accordance with the plain meaning of the terms of this Agreement and the intent of the parties as manifested hereby.

(7)    **No Waiver**

Any party may at any time or times, at its election, waive any of the conditions to its obligations hereunder, but any such waiver shall be effective only if contained in a writing signed by such party (except that if a party proceeds to Closing, notwithstanding the failure of a condition to its obligation to close, then such condition shall be deemed waived by the Closing). No such waiver shall reduce the rights or remedies of a party by reason of any

- 16 -

SV 346,261,144v2

breach by the other party hereunder. Waiver by one party of the performance of any covenant, condition or promise of the other party shall not invalidate this Agreement, nor shall it be deemed to be a waiver by such party of the performance of any other covenant, condition or promise by such other party (whether preceding or succeeding and whether or not of the same or similar nature). No failure or delay by one party to exercise any right it may have by reason of the default of the other party shall operate as a waiver of default or modification of this Agreement or shall prevent the exercise of any right by such party while the other party continues to be so in default.

### (8)     Consents and Approvals

Except as otherwise expressly provided herein, any approval or consent provided to be given by a party hereunder may be given or withheld in the absolute discretion of such party.

### (9)     Governing Law

THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TENNESSEE (WITHOUT REGARD TO CONFLICTS OF LAW).

### (10)    Third Party Beneficiaries

Except as otherwise expressly provided in this Agreement, Seller and Buyer do not intend by any provision of this Agreement to confer any right, remedy or benefit upon any third party (express or implied), and no third party shall be entitled to enforce or otherwise shall acquire any right, remedy or benefit by reason of any provision of this Agreement.

### (11)    Amendments

This Agreement may be amended by written agreement of amendment executed by all parties, but not otherwise.

### (12)    Survival

Unless otherwise expressly provided for in this Agreement, the representations, warranties, indemnification obligations and covenants of the parties set forth in this Agreement shall survive the consummation of the transaction contemplated by this Agreement and the delivery and recordation of the Deed. All warranties and representations shall be effective regardless of any investigation made or which could have been made.

### (13)    Cumulative Remedies

No remedy conferred upon a party in this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute (except as otherwise expressly herein provided).

- 17 -

2-20-08   19.4
2-20-08   19.5

### (14)  Certain Definitions

As used in this Agreement, the following terms shall have the following meanings:

(a)  **"Bankruptcy/Dissolution Event"** means the occurrence of any of the following:  (i) the commencement of a case under Title 11 of the U.S. Code, as now constituted or hereafter amended, or under any other applicable federal or state bankruptcy law or other similar law; (ii) the appointment of a trustee or receiver of any property interest; (iii) an assignment for the benefit of creditors; (iv) an attachment, execution or other judicial seizure of a substantial property interest; (v) the taking of, failure to take, or submission to any action indicating an inability to meet its financial obligations as they accrue; or (vi) a dissolution or liquidation, death or incapacity.

(b)  **"Business Agreement"** means any lease, rental agreement, loan agreement, mortgage, easement, covenant, restriction or other agreement or instrument at any time or times affecting all or a portion of the Property.

(c)  **"Claim"** means any obligation, liability, claim (including any claim for damage to property or injury to or death of any persons), lien or encumbrance, loss, damage, cost or expense (including any judgment, award, settlement, reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim [including appellate proceedings], and any collection costs or enforcement costs).

(d)  **"Hazardous Material"** means any hazardous, toxic or dangerous waste, substance or material, pollutant or contaminant, as defined for purposes of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 *et seq.*), as amended, or the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 *et seq.*), as amended,  or any other Laws, or any substance which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous, or any substance which contains gasoline, diesel fuel or other petroleum hydrocarbons, polychlorinated biphenyls (PCBs), or radon gas, urea formaldehyde, asbestos or lead.

(e)  **"Laws"** means all federal, state and local laws, moratoria, initiatives, referenda, ordinances, rules, regulations, standards, orders, zoning conditions and other governmental requirements (including those relating to the environment, health and safety, or handicapped persons) applicable to the Property.

(f)  **"Permits"** means all permits, licenses, approvals, entitlements and other governmental authorizations (including certificates of occupancy) required in connection with the ownership, planning, development, construction, use, operation or maintenance of the Property.

SV 346,261,144v2

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 64 of 107 PageID #: 68

### H. WAIVER OF TRIAL BY JURY

To the maximum extent permitted under applicable law, the parties hereby irrevocably waive their respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement. This waiver shall apply to any subsequent amendments, renewals, supplements or modifications to this Agreement. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

### I. PRESS RELEASES

Any press release issued with respect to the transactions contemplated by this Agreement shall be subject to the prior approval of Buyer.

### J. COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which, when taken together, shall constitute one and the same instrument, with the same effect as if all of the parties to this Agreement had executed the same counterpart.

THE SUBMISSION OF THIS AGREEMENT FOR EXAMINATION IS NOT INTENDED TO NOR SHALL CONSTITUTE AN OFFER TO SELL, OR A RESERVATION OF, OR OPTION OR PROPOSAL OF ANY KIND FOR THE PURCHASE OF THE PROPERTY. IN NO EVENT SHALL ANY DRAFT OF THIS AGREEMENT CREATE ANY OBLIGATION OR LIABILITY, IT BEING UNDERSTOOD THAT THIS AGREEMENT SHALL BE EFFECTIVE AND BINDING ONLY WHEN A COUNTERPART HEREOF HAS BEEN EXECUTED AND DELIVERED BY EACH PARTY HERETO.

[Signature page follows.]

SV 346,261,144v2

AAH 2-20-08 19:40
E.D.H 2-20-08 19:5

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

*Counter Offer*
*Submitted - Not Accepted*
*As Written - Countered*
*JAH*
*D.H*

**SELLER:**

_James Hambrick_ – *Countered*
James Hambrick

_Denise Hambrick_ – *Countered*
Denise Hambrick

**BUYER:**

RM Wilson County Investor, LLC,
a California limited liability company

By:_____

Name:_____

Title:_____

SV 346,261,144v2

## REAL PROPERTY PURCHASE AGREEMENT

## EXHIBIT LIST

Exhibit "A"  &ndash;  Description of Land

Exhibit "B"  &ndash;  Description of Due Diligence Package

Exhibit "C"  &ndash;  Form of Special Warranty Deed

Exhibit "D"  &ndash;  Form of Bill of Sale, Assignment and Assumption

SV 346,261,144v2

## LEGAL DESCRIPTION OF LAND

Being property lying in the 24th Civil District of Wilson County, Tennessee, and being more particularly described as follows:

**PARCEL 1**:

Being described by survey of John W. Burke, Jr., Registered Land Surveyor, dated 11/14/89 and being described as follows:

Beginning at an iron pin set in the northeast corner of the Jennette property of record in Book 311 at page 247, Register's Office of Wilson County, Tennessee, said property being located in the Carter Subdivision in the 24th Civil District of Wilson County, Tennessee, of record in Book 19, at page 28, Register's Office of Wilson County, Tennessee, and proceeding as follows:

With the right-of-way of North Posey Hill Road North 4 degrees 00 minutes a distance of 150.00' to an iron pin set in the northeast corner; thence leaving the right-of-way and with the east line of the property conveyed to Herman E. Carter, Jr., and wife, Lila Mae Carter, by deed of record in Book 291, at page 252, South 87 degrees 28 minutes West 291.0' to an iron pin set in the northwest corner; thence South 4 degrees 00 minutes West a distance of 150.00' to an iron pin set in the southwest corner; thence North 87 degrees 28 minutes East a distance of 291.00' to the point of beginning and containing 1.0 acres, more or less.

**PARCEL 2**:

Being bounded generally as follows: North by Carter (formerly Meriwether); East by Posey Hill Road; South by Vinegar Hill Road; and West by Ligon.

**PARCEL 3**:

Being bounded generally as follows: On the North by Asa Majors Land; on the East by Public Road; on the South by Alvin Lowe and on the West by R.H. Drury and wife.

Being the same property conveyed to James Hambrick and wife, Denise Hambrick by quitclaim deed from Lila Mae Carter of record in Book _____, Page _____, Register's Office for Wilson County, Tennessee.

**PARCEL 4**:

Land located in the 24th Civil District of Wilson County, Tennessee on the northerly margin of Posey Hill Road, 194.84 feet west of South Posey Hill Road described according to a boundary survey dated 8-27-04 by Campbell, McRae and Associates Surveying, Inc. (John Hood TN R.L.S. # 1838) as follows:

Beginning at an iron rod (old) on the northerly margin of Posey Hill Road, said rod being located N 88 degrees 10' 52" W 194.84 feet from the northwest R.O.W. intersection of said Posey Hill Road and of South Posey Hill Road and being the southwest corner of the Charles H. Jones Land (Book 454, Page 822 R.O.W.C., TN) as shown on a boundary survey of the James R. and Janice Stevenson Land (Plat Book 21, Page 600 R.O.W.C. TN); thence with the northerly margin of said Posey Hill Road N 87 degrees 42' 20" W 442.91 feet to an iron rod (old) at the southeast corner of the Robert W. Tuck Land (Book 800, Page 1844 R.O.W.C., TN) thence leaving said northerly margin with said tuck N 04 degrees 04' 46" E 526.10 feet to an iron rod (new); thence leaving said tuck and severing the land described in Book 457, Page 736, R.O.W.C., TN, (parent tract to the herein described land) S 85 degrees 55" 14" E 344.32 feet to an iron rod (new) in the westerly line of the Michael W. Carter Land (Book 418, Page 872 R.O.W.C., TN) as shown in a plat entitled Carter Subdivision recorded in Plat Book 19, Page 28, R.O.W.C., TN; thence with said Carter S 03 degrees 14' 47" W 118.64 feet to an iron rod (old) at said Carter's southwest corner, thence N 86 degrees 42' 47" E 92.19 feet to an iron rod (old) at said Jones's northwest corner; thence with said Jones S 03 degrees 21' 55" W 265.91 feet to an iron rod (old); thence S 03 degrees 17' 51" W 139.62 feet to the point of beginning containing 5.00 acres more or less.

Being the same property conveyed to James Hambrick by quitclaim deed from Lila Carter of record in Book 1074, Page 38, said Register's Office for Wilson County, Tennessee.

## DESCRIPTION OF DUE DILIGENCE PACKAGE

The Due Diligence Package shall contain each of the following:

(1)  Tax bills for the Property for the last three full calendar years prior to the year in which this Agreement is executed, together with the tax bill for the current year.

(2)  Utility bills (gas, electric, water, and sewer) for the last three full calendar years prior to the year in which this Agreement is executed, together with utility bills for the current year to date.

(3)  Special or extraordinary bills for the last three full calendar years prior to the year in which this Agreement is executed, together with the current year to date.

(4)  True correct and complete copies of any leases, equipment leases and service contracts affecting the Property.

(5)  Environmental, asbestos, soils and physical inspection reports commissioned by you and/or in your possession.

(6)  Appraisals of the Property done within the past three (3) years, if any.

(7)  Complete building plans and specifications.

(8)  The Title Commitment and Survey.

(9) .  Final, unqualified and unconditional certificates of occupancy relating to the entire Improvements.

(10)  Copies of all Permits

(11)  Evidence of the zoning of the Property

JAH  2-20-08  19:48
Co. D.H  2-20-08  19:50

## FORM OF SPECIAL WARRANTY DEED

| | |
|---|---|
| **NEW OWNER:**<br><br>RM WILSON COUNTY INVESTOR, LLC<br>4525 DISTRICT BOULEVARD<br>VERNON, CALIFORNIA 90058 | **THIS INSTRUMENT PREPARED BY:**<br><br>Greenberg Traurig, LLP<br>2450 Colorado Avenue<br>Suite 400E,<br>Santa Monica CA 90404<br>Attn: Carol Perrin, Esq. |
| **SEND TAX BILLS TO:**<br>NEW OWNER | |
| **Map/Parcel:**<br><br><br>Map ___ Parcel _____ | STATE OF TENNESSEE          )<br>COUNTY OF                               )<br>THE ACTUAL CONSIDERATION OR VALUE, WHICHEVER<br>IS GREATER, FOR THIS TRANSFER IS $_____ .<br><br>_____<br>                                              AFFIANT<br>SUBSCRIBED AND SWORN TO BEFORE ME, THIS THE _____<br>DAY OF _____, 20_____.<br><br>_____<br>                                              NOTARY PUBLIC<br>My Commission expires:_____ |

## Special Warranty Deed

**For and in Consideration of** the sum of [_____] DOLLARS ($_____) cash in hand paid by the hereinafter named grantee, and other good and valuable consideration, the receipt of which is hereby acknowledged, JAMES HAMBRICK and DENISE HAMBRICK, husband and wife, hereinafter collectively called the **GRANTORS**, have bargained and sold, and by these presents do transfer and convey unto RM WILSON COUNTY INVESTOR, LLC, a California limited liability company, hereinafter called the **GRANTEE**, its heirs and assigns, a certain tract or parcel of land in Wilson County, Tennessee, described as follows, to wit:

See Exhibit A attached hereto attached for legal description.

THIS IS <u>IMPROVED</u> PROPERTY.

To Have and to Hold the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging to the said GRANTEE, its successors and assigns, forever. GRANTORS do covenant with said GRANTEE that GRANTORS are lawfully seized and possessed of said land in fee simple, have a good right to convey it, and the same is unencumbered, except as set forth on Exhibit B. GRANTORS do further covenant and bind themselves, their successors, assigns and representatives, to warrant and forever defend the title to the said land to the GRANTEE, its successors and assigns, against the lawful claims of all persons whomsoever claiming by, through or under Grantors but not further or otherwise.

Except as expressly represented, warranted or covenanted by Grantors herein, the conveyance of the land herein to Grantee is "AS IS," "WHERE IS AND WITH ALL FAULTS."

[Signature Page Follows]

C-1

SV 346,261,144v2

IN WITNESS WHEREOF, GRANTORS have duly executed this Special Warranty Deed as of the ____ day of _____, 2008.

GRANTOR:

_____
James Hambrick

_____
Denise Hambrick

SV 346,261,144v2

JAH   2-20-08   19:48
E.D.H   2-20-08   19:50

[Insert Tennessee form of notary acknowledgment]

SV 346,261,144v2

*JAH* 2-20-08 *19:4*
*E.D.H* 2-20-08 *19:5*

EXHIBIT A

LEGAL DESCRIPTION

JAH 2-20-08  19:48
E.D.H 2-20-08  19:50

FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

2-20-08    19:48
2-20-08    19:50

# BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

FOR VALUABLE CONSIDERATION, receipt and adequacy of which is hereby acknowledged, the undersigned, James Hambrick and Denise Hambrick, husband and wife, (collectively, "**Assignor**"), hereby sell, transfer, assign and convey to RM Wilson County Investor, LLC, a California limited liability company ("**Assignee**"), the following: (1) the "Personal Property" (including, without limitation, the items described in Schedule "1" attached hereto and made a part hereof); and (2) the "Intangible Property". The terms "Personal Property" and "Intangible Property" shall have the respective definitions set forth in that certain agreement ("**Purchase Agreement**") captioned "REAL PROPERTY PURCHASE AGREEMENT", dated as of February __, 2008, by and between Assignor and Assignee.

The covenants, agreements, representations, warranties, indemnities and limitations provided in the Purchase Agreement with respect to the property conveyed hereunder, are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Assignee and Assignor and their respective successors and assigns.

This Bill of Sale, Assignment and Assumption may be executed in one or more identical counterparts, each of which such counterpart shall be deemed an original for all purposes and all such counterparts collectively consisting of one such Bill of Sale, Assignment and Assumption.

SV 346,261,144v2

JAH 2-20-08 19:48
E.D.H 2-20-08 19:50

IN WITNESS WHEREOF, Assignor and Assignee have executed this Bill of Sale, Assignment and Assumption as of _____, 2008.

**ASSIGNOR:**

_James Hambrick – Counter offer_
James Hambrick

_Denise Hambrick – Counter offer_
Denise Hambrick

**ASSIGNEE:**

RM Wilson County Investor, LLC,
a California limited liability company

By: _____

Name: _____

Title: _____

# COUNTER OFFER #___1___

This is a Counter Offer from ☒ Seller to Buyer    OR    ☐ Buyer to Seller

The undersigned agree to and accept the Purchase and Sales Agreement with an offer date of ___20 Feb 08___

for the purchase of real property commonly known as

___'05    Posey Hill_____ Mt Juliet _____ TN _____ 37122_____

with the following exceptions:    *Address, City, State, Zip*

1) As stated on Page 9 item 11, this agreement is subject to the expiration of the "REAL PROPERTY PURCHASE AGREEMENT" between James Hambrick and wife, Denise Hambrick ("SELLER") and CRK REAL ESTATE, LLC which is attached as EXHIBIT "E"

2) Seller must net $500,000.xx at closing.

3) Seller shall have the right to sell all possessions on the Property and any structures or contents on the Property for a period of one (1) year after the date of closing.

4) Due Diligence Period changed to read 14 days from binding agreement date.

5) Seller allows Buyer to conduct any and all inspections, including but not limited to ALTA Survey, Title Search, Environmental Studies at Buyer's expense. Seller will not be responsible for obtaining or obligated to procure any documents or inspections other than the ones attached to this counter offer.

6) If any item in this counter offer conflicts with any original offer, then this document shall have control over the original document.

7) All notifications should be considered Central Standard Time

ALL OTHER TERMS AND CONDITIONS OF THE ORIGINAL ATTACHED PURCHASE AND SALE AGREEMENT ARE ACCEPTABLE TO THE UNDERSIGNED. ALL TERMS AND CONDITIONS PROPOSED IN PREVIOUS COUNTER OFFERS, IF ANY, ARE NOT INCLUDED IN THIS COUNTER OFFER UNLESS RESTATED HEREIN.

*Until notice of acceptance is delivered* the subject property is still on the market for sale, and this offer may be revoked at any time with notice, and the property may be sold to any other party.

Time Limit of Offer: This Offer may be withdrawn at any time before acceptance with notice. Offer terminates if not accepted by __2__ o'clock ☐ am/☒ pm; on the __22nd__ day of ___February___ , __2008__

| | |
|---|---|
| *(signature)* 2-20-08 | *(signature)* 2-20-08 |
| (Seller)/ Buyer *(Party making counter offer)* DATE | (Seller)/ Buyer *(Party making counter offer)* DATE |

The undersigned has received and

   ☐ **ACCEPTED** this offer

   ☐ **REJECTED** this offer

   ☐ **COUNTERED** this offer with Counter Offer # _____

____ o'clock ☐ am/☐ pm; this _____ day of _____ , _____ .

_____    _____
Seller / Buyer *(Responding Party)*    Seller / Buyer *(Responding Party)*

**Binding Agreement Date.** This instrument shall become a "Binding Agreement" on the date ("Binding Agreement Date") the last offeror, or licensee of offeror, receives notice of offeree's acceptance. Notice of acceptance of the final offer was provided

on _____ day of _____ at _____ by _____
                                        *time*                *name*

*NOTE: This form is provided by TAR to its members for their use in real estate transactions and is to be used as is. By downloading and/or using this form, you agree and covenant not to alter, amend, or edit said form or its content except as where provided in the blank fields, and agree and acknowledge that any such alteration, amendment or edit of said form is done at your own risk. Use of the TAR logo in conjunction with any form other than standardized forms created by TAR is strictly prohibited. This form is subject to periodic revision and it is the responsibility of the member to use the most recent available form.*

T*A*R    Copyright ©2008 by Tennessee Association of REALTORS®
F8 Counter Offer

                                                Modified 1/1/2008

This form presented by [illegible] · www.[illegible].com

# SPECIAL WARRANTY DEED

| NEW OWNER:<br><br>RM WILSON COUNTY INVESTOR, LLC<br>4525 DISTRICT BOULEVARD<br>VERNON, CALIFORNIA 90058 | THIS INSTRUMENT PREPARED BY:<br><br>Greenberg Traurig, LLP<br>2450 Colorado Avenue<br>Suite 400E,<br>Santa Monica CA 90404<br>Attn: Carol Perrin, Esq. |
| --- | --- |
| SEND TAX BILLS TO:<br>NEW OWNER | |
| Map/Parcel:<br><br>Map 95 Parcel 602<br>Map 95 Parcel 600<br>Map 95 Parcel 701 | STATE OF TENNESSEE )<br>COUNTY OF Davidson )<br>THE ACTUAL CONSIDERATION OR VALUE, WHICHEVER IS GREATER, FOR THIS TRANSFER IS $500,000.00<br><br>Denise D Knowles<br>          AFFIANT<br>SUBSCRIBED AND SWORN TO BEFORE ME, THIS THE 1st DAY OF April, 2008.<br><br>Dorothy S. Potts<br>         NOTARY PUBLIC<br>My Commission expires: |

*[Notary seal: DOROTHY S. POTTS, STATE OF TENNESSEE, NOTARY PUBLIC, DAVIDSON COUNTY. My Commission Expires AUG. 23, 2011]*

## Special Warranty Deed

For and in Consideration of the sum of [ TEN ] DOLLARS ($10.00 ) cash in hand paid by the hereinafter named grantee, and other good and valuable consideration, the receipt of which is hereby acknowledged, JAMES HAMBRICK and DENISE HAMBRICK, husband and wife, hereinafter collectively called the GRANTORS, have bargained and sold, and by these presents do transfer and convey unto RM WILSON COUNTY INVESTOR, LLC, a California limited liability company, hereinafter called the GRANTEE, its heirs and assigns, a certain tract or parcel of land in Wilson County, Tennessee, described as follows, to wit:

  See Exhibit A attached hereto attached for legal description.

  THIS IS IMPROVED PROPERTY.

To Have and to Hold the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging to the said GRANTEE, its successors and assigns, forever. GRANTORS do covenant with said GRANTEE that GRANTORS are lawfully seized and possessed of said land in fee simple, have a good right to convey it, and the same is unencumbered, except as set forth on Exhibit B. GRANTORS do further covenant and bind themselves, their successors, assigns and representatives, to warrant and forever defend the title to the said land to the GRANTEE, its successors and assigns, against the lawful claims of all persons whomsoever claiming by, through or under Grantors but not further or otherwise.

  Except as expressly represented, warranted or covenanted by Grantors herein, the conveyance of the land herein to Grantee is "AS IS," "WHERE IS AND WITH ALL FAULTS."

[Signature Page Follows]

C-1

LV 346281144v3

Case 3:14-cv-01052 Document 1-1 Filed 04/24/14 Page 79 of 107 PageID #: 83

*March,* IN WITNESS WHEREOF, GRANTORS have duly executed this Special Warranty Deed as of the _31st_ day of March, 2008.

**GRANTOR:**

James Hambrick

Denise Hambrick

SV 346261144v3

BEING PROPERTY LYING IN THE 24TH CIVIL DISTRICT OF WILSON COUNTY, TENNESSEE, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PARCEL 1:

BEING DESCRIBED BY SURVEY JOHN W. BURKE, JR., REGISTERED LAND SURVEYOR, DATED 11/14/89 AND BEING DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN SET IN THE NORTHEAST CORNER OF THE JEANNETTE PROPERTY OF RECORD IN BOOK 311, PAGE 247, REGISTER'S OFFICE OF WILSON COUNTY, TENNESSEE, SAID PROPERTY BEING LOCATED IN THE CARTER SUBDIVISION IN THE 24TH CIVIL DISTRICT OF WILSON COUNTY, TENNESSEE, OF RECORD IN BOOK 19, AT PAGE 28, REGISTER'S OFFICE OF WILSON COUNTY, TENNESSEE, AND PROCEEDING AS FOLLOWS:

WITH THE RIGHT-OF-WAY OF NORTH POSEY HILL ROAD NORTH 4 DEGREES 00 MINUTES A DISTANCE OF 150.00 FEET TO AN IRON PIN SET IN THE NORTHEAST CORNER; THENCE LEAVING THE RIGHT-OF-WAY AND WITH THE EAST LINE OF THE PROPERTY CONVEYED TO HERMAN E. CARTER, JR., AND WIFE, LILA MAE CARTER, BY DEED OF RECORD IN BOOK 291, PAGE 252, SOUTH 87 DEGREES 28 MINUTES WEST 291.0 FEET TO AN IRON PIN SET IN THE SOUTHWEST CORNER; THENCE NORTH 87 DEGREES 28 MINUTES EAST A DISTANCE OF 291.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.0 ACRES, MORE OR LESS.

PARCEL 2:

BEING BOUNDED GENERALLY AS FOLLOWS: NORTH BY CARTER (FORMERLY MERIWETHER); EAST BY POSEY HILL ROAD; SOUTH BY VINEGAR HILL ROAD; AND WEST BY LIGON.

PARCEL 3:

BEING BOUNDED GENERALLY AS FOLLOWS: ON THE NORTH BY ASA MAJORS LAND; ON THE EAST BY PUBLIC ROAD; ON THE SOUTH BY ALVIN LOWE AND ON THE WEST BY R.H. DRURY AND WIFE.

PARCEL 4:

LAND LOCATED IN THE 24TH CIVIL DISTRICT OF WILSON COUNTY, TENNESSEE ON THE NORTHERLY MARGIN OF POSEY HILL ROAD, 194.84 FEET WEST OF SOUTH POSEY HILL ROAD DESCRIBED ACCORDING TO A BOUNDARY SURVEY DATED 8-27-04 BY CAMPBELL, MCRAE AND ASSOCIATES SURVEYING, INC. (JOHN HOOD TN. R.L.S.#1838) AS FOLLOWS:

STATE OF TENNESSEE        }
COUNTY OF DAVIDSON                              }

Personally appeared before me, the undersigned authority, a Notary Public in and for said County and State, the within named James Hambrick and Denise Hambrick the bargainors, with whom I am personally acquainted (or proved to me in the basis of satisfactory evidence), and who acknowledged that they executed the within instrument for the purposes therein contained.

Witness my hand and official seal at office this _31st_ day of ____March____, 2008.

My Commission expires:

_____



My Commission Expires AUG. 23, 2011

_Dorothy S. Potts_

Notary Public

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 82 of 107 PageID #: 86

# SPECIAL WARRANTY DEED

| NEW OWNER: | THIS INSTRUMENT PREPARED BY: |
|---|---|
| RM WILSON COUNTY INVESTOR, LLC<br>4525 DISTRICT BOULEVARD<br>VERNON, CALIFORNIA 90058 | Greenberg Traurig, LLP<br>2450 Colorado Avenue<br>Suite 400E,<br>Santa Monica CA 90404<br>Attn: Carol Perrin, Esq. |
| SEND TAX BILLS TO:<br>NEW OWNER | |
| Map/Parcel:<br><br>Map 95 Parcel 602<br>Map 95 Parcel 600<br>Map 95 Parcel 701 | STATE OF TENNESSEE )<br>COUNTY OF Davidson )<br>THE ACTUAL CONSIDERATION OR VALUE, WHICHEVER<br>IS GREATER, FOR THIS TRANSFER IS $500,000.°<br><br>_Denise S. Knowles_<br>AFFIANT<br>SUBSCRIBED AND SWORN TO BEFORE ME, THIS THE 1st<br>DAY OF April , 20 08 .<br>_Dorothy S. Potts_<br>NOTARY PUBLIC<br>My Commission expires:_____ |

*(Notary seal: DOROTHY S. POTTS, STATE OF TENNESSEE, NOTARY PUBLIC, DAVIDSON COUNTY, My Commission Expires AUG. 23, 2011)*

## Special Warranty Deed

For and in Consideration of the sum of [ TEN ] DOLLARS ($10.00 ) cash in hand paid by the hereinafter named grantee, and other good and valuable consideration, the receipt of which is hereby acknowledged, JAMES HAMBRICK and DENISE HAMBRICK, husband and wife, hereinafter collectively called the GRANTORS, have bargained and sold, and by these presents do transfer and convey unto RM WILSON COUNTY INVESTOR, LLC, a California limited liability company, hereinafter called the GRANTEE, its heirs and assigns, a certain tract or parcel of land in Wilson County, Tennessee, described as follows, to wit:

See Exhibit A attached hereto attached for legal description.

THIS IS IMPROVED PROPERTY.

To Have and to Hold the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging to the said GRANTEE, its successors and assigns, forever. GRANTORS do covenant with said GRANTEE that GRANTORS are lawfully seized and possessed of said land in fee simple, have a good right to convey it, and the same is unencumbered, except as set forth on Exhibit B. GRANTORS do further covenant and bind themselves, their successors, assigns and representatives, to warrant and forever defend the title to the said land to the GRANTEE, its successors and assigns, against the lawful claims of all persons whomsoever claiming by, through or under Grantors but not further or otherwise.

Except as expressly represented, warranted or covenanted by Grantors herein, the conveyance of the land herein to Grantee is "AS IS," "WHERE IS AND WITH ALL FAULTS."

[Signature Page Follows]

IN WITNESS WHEREOF, GRANTORS have duly executed this Special Warranty Deed as of the 31st day of March, 2008.

**GRANTOR:**

_James Hambrick_
James Hambrick

_Denise Hambrick_
Denise Hambrick

C-2

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 84 of 107 PageID #: 88

STATE OF TENNESSEE      }
COUNTY OF DAVIDSON                    }

Personally appeared before me, the undersigned authority, a Notary Public in and for said County and State, the within named James Hambrick and Denise Hambrick the bargainors, with whom I am personally acquainted (or proved to me in the basis of satisfactory evidence), and who acknowledged that they executed the within instrument for the purposes therein contained.

Witness my hand and official seal at office this _31st_ day of _March_____, 2008.

My Commission expires:

_____

_Dorothy S. Potts_____

Notary Public

DOROTHY S. POTTS
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY
My Commission Expires AUG. 23, 2011

BEING PROPERTY LYING IN THE 24TH CIVIL DISTRICT OF WILSON COUNTY, TENNESSEE, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PARCEL 1:

BEING DESCRIBED BY SURVEY JOHN W. BURKE, JR., REGISTERED LAND SURVEYOR, DATED 11/14/89 AND BEING DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN SET IN THE NORTHEAST CORNER OF THE JEANNETTE PROPERTY OF RECORD IN BOOK 311, PAGE 247, REGISTER'S OFFICE OF WILSON COUNTY, TENNESSEE, SAID PROPERTY BEING LOCATED IN THE CARTER SUBDIVISION IN THE 24TH CIVIL DISTRICT OF WILSON COUNTY, TENNESSEE, OF RECORD IN BOOK 19, AT PAGE 28, REGISTER'S OFFICE OF WILSON COUNTY, TENNESSEE, AND PROCEEDING AS FOLLOWS:

WITH THE RIGHT-OF-WAY OF NORTH POSEY HILL ROAD NORTH 4 DEGREES 00 MINUTES A DISTANCE OF 150.00 FEET TO AN IRON PIN SET IN THE NORTHEAST CORNER; THENCE LEAVING THE RIGHT-OF-WAY AND WITH THE EAST LINE OF THE PROPERTY CONVEYED TO HERMAN E. CARTER, JR., AND WIFE, LILA MAE CARTER, BY DEED OF RECORD IN BOOK 291, PAGE 252, SOUTH 87 DEGREES 28 MINUTES WEST 291.0 FEET TO AN IRON PIN SET IN THE SOUTHWEST CORNER; THENCE NORTH 87 DEGREES 28 MINUTES EAST A DISTANCE OF 291.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.0 ACRES, MORE OR LESS.

PARCEL 2:

BEING BOUNDED GENERALLY AS FOLLOWS:  NORTH BY CARTER (FORMERLY MERIWETHER); EAST BY POSEY HILL ROAD; SOUTH BY VINEGAR HILL ROAD; AND WEST BY LIGON.

PARCEL 3:

BEING BOUNDED GENERALLY AS FOLLOWS:  ON THE NORTH BY ASA MAJORS LAND; ON THE EAST BY PUBLIC ROAD; ON THE SOUTH BY ALVIN LOWE AND ON THE WEST BY R.H. DRURY AND WIFE.

PARCEL 4:

LAND LOCATED IN THE 24TH CIVIL DISTRICT OF WILSON COUNTY, TENNESSEE ON THE NORTHERLY MARGIN OF POSEY HILL ROAD, 194.84 FEET WEST OF SOUTH POSEY HILL ROAD DESCRIBED ACCORDING TO A BOUNDARY SURVEY DATED 8-27-04 BY CAMPBELL, MCRAE AND ASSOCIATES SURVEYING, INC. (JOHN HOOD TN. R.L.S.#1838) AS FOLLOWS:

BEGINNING AT AN IRON ROD (OLD) ON THE NORTHERLY MARGIN OF POSEY HILL ROAD, SAID ROD BEING LOCATED N 88°10'52" W 194.84 FEET FROM THE NORTHWEST R.O.W. INTERSECTION OF SAID POSEY HILL ROAD AND OF SOUTH POSEY HILL ROAD AND BEING THE SOUTHWEST CORNER OF THE CHARLES H. JONES LAND (BOOK 454, PAGE 822 R.O.W.C.,TN.) AS SHOWN ON A BOUNDARY SURVEY OF THE JAMES R AND JANICE STEVENSON LAND (PLAT BOOK 21, PAGE 600 R.O.W.C., TN.); THENCE WITH THE NORTHERLY MARGIN OF SAID POSEY HILL ROAD N 87°42'20" W 442.91 FEET TO AN IRON ROD (OLD) AT THE SOUTHEAST CORNER OF THE ROBERT W. TUCK LAND (BOOK 800, PAGE 1844 R.O.W.C., TN.); THENCE LEAVING SAID NORTHERLY MARGIN WITH SAID TUCK N 04°04'46" E 526.10 FEET TO AN IRON ROD (NEW); THENCE LEAVING SAID TUCK AND SEVERING THE LAND DESCRIBED IN BOOK 457, PAGE 736 R.O.W.C., TN. (PARENT TRACT TO THE HEREIN DESCRIBED LAND) S 85°55'14" E 344.32 FEET TO AN IRON ROD (NEW) IN THE WESTERLY LINE OF THE MICHAEL W. CARTER LAND (BOOK 418, PAGE 872 R.O.W.C., TN.) AS SHOWN IN A PLAT ENTITLED CARTER SUBDIVISION RECORDED IN PLAT BOOK 19, PAGE 28 R.O.W.C.,TN.; THENCE WITH SAID CARTER S 03°14'47" W 118.64 FEET TO AN IRON ROD (OLD) AT SAID CARTER'S SOUTHWEST CORNER; THENCE N 86°42'47" E 92.19 FEET TO AN IRON ROD (OLD) AT SAID JONES'S NORTHWEST CORNER; THENCE WITH SAID JONES S 03°21'55" W 265.91 FEET TO AN IRON ROD (OLD); THENCE S 03°17'51" W 139.62 FEET TO THE POINT OF BEGINNING CONTAINING 5.00 ACRES MORE OR LESS.

SAID PROPERTY ALSO BEING DESCRIPTION ON SURVEY PREPARED BY PAUL BURTON CORCKETT, RLS NO. 1394, CROCKETT SURVEYING, DATED 3/26/08, JOB NO. 08-9448-WC.

PARCEL 1

BEGINNING ON AN IRON PIN IN THE NORTH MARGIN OF POSEY HILL ROAD, SAID PIN BEING THE SOUTHWEST CORNER OF THE CHARLES JONES PROPERTY AND THE SOUTHEAST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE WITH SAID MARGIN OF SAID ROAD NORTH 84 DEGS. 59 MINS. 43 SECS. WEST 442.95 FEET TO AN IRON PIN, SAID PIN BEING THE SOUTHEAST CORNER OF THE ROBERT W. TUCK PROPERTY AND THE SOUTHWEST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE LEAVING NORTH MARGIN OF POSEY HILL ROAD AND RUNNING NORTH 06 DEGS. 44 MINS. 10 SECS. EAST 526.02 FEET TO AN IRON PIN, SAID PIN BEING THE SOUTHWEST CORNER OF PARCEL 2 AND THE NORTHWEST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE SOUTH 83 DEGS. 13 MINS. 15 SECS. EAST 344.79 FEET TO AN IRON PIN IN THE WEST BOUNDARY LINE OF PARCEL 3, THENCE SOUTH 05 DEGS. 57 MINS. 59 SECS. WEST 118.45 FEET TO AN IRON PIN, SAID PIN BEING THE SOUTHWEST CORNER OF PARCEL 3, THENCE NORTH 89 DEGS. 26 MINS. 43 SECS. EAST 92.23 FEET TO AN IRON

PIN, SAID PIN BEING THE NORTHWEST CORNER OF THE CHARLES JONES PROPERTY AND THE NORTHEAST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE SOUTH 06 DEGS. 04 MINS. 14 SECS. WEST 266.05 FEET TO AN IRON PIN, THENCE SOUTH 06 DEGS. 00 MINS. 10 SECS. WEST 139.62 FEET TO THE POINT OF BEGINNING AND CONTAINING 5.00 ACRES MORE OR LESS BY SURVEY.

PARCEL 2

BEGINNING ON AN IRON PIN IN THE WEST MARGIN OF SOUTH POSEY HILL ROAD, SAID PIN BEING THE SOUTHEAST CORNER OF THE RM WILSON COUNTY INVESTORS PROPERTY AND THE NORTHEAST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE WITH SAID MARGIN OF SAID ROAD SOUTH 07 DEGS. 20 MINS. 45 SECS. WEST 269.50 FEET TO AN IRON PIN, SAID PIN BEING THE NORTHEAST CORNER OF PARCEL 3 AND THE SOUTHEAST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE LEAVING WEST MARGIN OF SOUTH POSEY HILL ROAD AND RUNNING SOUTH 89 DEGS. 26 MINS. 54 SECS. WEST 291.17 FEET TO AN IRON PIN, THENCE SOUTH 05 DEGS. 57 MINS. 59 SECS. WEST 31.56 FEET TO AN IRON PIN, THENCE NORTH 83 DEGS. 13 MINS. 15 SECS WEST 344.79 FEET TO AN IRON PIN IN THE EAST BOUNDARY LINE OF THE ROBERT W. TUCK PROPERTY, SAID PIN BEING THE SOUTHWEST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE NORTH 06 DEGS. 44 MINS. 10 SECS. EAST 318.09 FEET TO AN IRON PIN, SAID PIN BEING THE SOUTHWEST CORNER OF THE RM WILSON COUNTY INVESTORS PROPERTY AND THE NORTHWEST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE SOUTH 85 DEGS. 01 MINS. 54 SECS. EAST 636.36 FEET TO THE POINT OF BEGINNING AND CONTAINING 4.45 ACRES MORE OR LESS BY SURVEY.

PARCEL 3

BEGINNING ON AN IRON PIN IN THE WEST MARGIN OF SOUTH POSEY HILL ROAD, SAID PIN BEING THE SOUTHEAST CORNER OF PARCEL 2 AND THE NORTHEAST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE WITH SAID MARGIN OF SAID ROAD SOUTH 06 DEGS. 01 MINS. 25 SECS. WEST 150.01 FEET TO AN IRON PIN, SAID PIN BEING THE NORTHEAST CORNER OF THE CHARLES JONES PROPERTY AND THE SOUTHEAST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE LEAVING WEST MARGIN OF SOUTH POSEY HILL ROAD AND RUNNING SOUTH 89 DEGS. 26 MINS. 43 SECS. WEST 198.79 FEET TO AN IRON PIN, SOUTH 89 DEGS. 26 MINS. 43 SECS. WEST 92.23 FEET TO AN IRON PIN, SAID PIN BEING THE SOUTHWEST CORNER OF THE TRACT HEREIN DESCRIBED, THENCE NORTH 05 DEGS. 57 MINS. 59 SECS. EAST 118.45 FEET TO AN IRON PIN, NORTH 05 DEGS. 57 MINS. 59 SECS. EAST 31.56 SECS. EAST 31.56 FEET TO AN IRON PIN, SAID PIN BEING THE

PERSON.

BK/PG:1299/2012-2018

08364741

| | | |
|---|---|---|
| 7 PGS : AL - DEED | | |
| JEWEL BATCH: 137727 | | |
| 04/07/2008 - 09:20 AM | | |
| VALUE | | 500000.00 |
| MORTGAGE TAX | | 0.00 |
| TRANSFER TAX | | 1850.00 |
| RECORDING FEE | | 35.00 |
| DP FEE | | 2.00 |
| REGISTER'S FEE | | 1.00 |
| TOTAL AMOUNT | | 1888.00 |

STATE of TENNESSEE, WILSON COUNTY

JOHN B SPICKARD
REGISTER OF DEEDS

Book 1299  Page 2018

A.M. MAR 24 2014
10:35 P.M.
BARBARA WEBB, CLERK & MASTER
COURT, WILSON CO.

Whereas, Jay Wilfong and CRK Real Estate, LLC did enter into a contract for the purchase and sale of certain real property on or about the 12th day of October 2005, identified as Tract No. 4 on the Plan of A.H. Johnson Property, recorded at Book 16, page 478, Register's Office for Wilson County, Tennessee;

Whereas, Jay Wilfong and CRK Real Estate, LLC have agreed to restate the contract to adjust the time of payment of certain payments and the closing date;

Now, therefore, Jay Wilfong and CRK Real Estate, LLC do hereby restate the contract as follows:

Jay Wilfong, (hereinafter called "Seller") hereby sells and agrees to convey to CRK Real Estate, LLC (hereinafter called "Purchaser") and Purchaser hereby buys and agrees to pay for the following described real estate on Beckwith Road situated in Wilson County, Tennessee, to-wit:

Land in Wilson County being identified as Tract No. 4 on the plan of A. H. Johnson Property, recorded in Plat Book 16, page 478, Register's Office for Wilson County, Tennessee

Together with, all and singular, all improvements thereon and all rights and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys, or rights-of-way, such real estate, improvements, rights and appurtenances being herein referred to as the "Property".

This Contract is executed upon the following terms and conditions:

## ARTICLE I
## PURCHASE PRICE

1.1    Purchase Price.  The purchase price (the "Purchase Price") to be paid for the Property shall be One Million Sixty Thousand and No/100 Dollars ($1,060,000.00).  The Purchase Price shall be paid by Purchaser to Seller at the Closing by the delivery of good funds in the full amount of the Purchase Price as follows:

(a)    One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) less Ten Thousand and No/100 Dollars ($10,000.00) previously paid leaving a balance due and payable of One Hundred and Forty Thousand and No/100 Dollars ($140,000.00) down payment at closing within two business days of the execution of this Restated Contract and credited to the Purchase Price (the "Earnest Money").

(b)    Seller to carry back the difference between the Purchase Price and the cash down payment in a Deed of Trust Note payable at the rate of zero percent (0%) interest with a balloon payment due and payable on the third (3rd) anniversary date of the closing.

I

NJAG 538176 v3
2826075-000004 10/11/05

Book 1172  Page 914

(c)    One Hundred Fifteen Thousand and No/100 Dollars ($115,000.00) of the principal of the Deed of Trust Note shall be due and payable within five business days of the letting of bids by the State of Tennessee for the construction of the interchange at Interstate 40 and Beckwith Road, Wilson County, Tennessee and Purchaser's refinancing of its other surrounding property.

Any note or notes to be executed by Purchaser hereof shall be secured by a Deed of Trust with power of sale and containing such covenants as to taxes, insurance, default and other matters as Seller and Purchaser may reasonably agree.

After the due date for any payment due under the terms of this Contract, interest shall accrue at the rate of four percent (4%) above the then prime rate permitted by the laws of Tennessee.

1.2    The Permitted Exceptions. The Property shall be conveyed to Purchaser subject to no liens, charges, encumbrances, exceptions or reservations of any kind or character other than those exceptions approved by Purchaser in writing and an existing mortgage in the approximate principal amount of $59,000,000 ("First Mortgage") (the "Permitted Exceptions"). The First Mortgage shall be satisfied in full simultaneously with the payment provided for in ~~Section 1.1(c) above~~. If Seller fails to satisfy the First Mortgage as provided herein or the First Mortgage is declared in default or foreclosure proceedings are commenced, the Deed of Trust Note shall be reduced by the amount necessary to liquidate the First Mortgage and Purchaser shall have the right, but not the obligation, to liquidate the First Mortgage at Purchaser's option. Seller shall request the holder of the First Mortgage to provide Purchaser copies of all notices of delinquency and default simultaneously with delivery of such notices to Seller.

*Note And Deed of Trust*

ARTICLE II
SURVEY, TITLE REPORT, TITLE INSURANCE

2.1    Preliminary Title Report. Within thirty (30) days after the date Seller executes this Agreement, Purchaser, at Seller's sole cost and expense, shall cause the Title Company to issue and deliver to Purchaser a preliminary title report (the "Title Report") accompanied by two (2) copies of all recorded documents relating to easements, right-of-way, etc., affecting the Property. Purchaser shall give the Seller written notice on or before the expiration of fifteen (15) days after the receipt of the Title Report and the Survey provided for below that the condition of title as set forth in such Title Report and Survey is or is not satisfactory and in the event Purchaser states that the condition of title is not satisfactory, Seller, shall at its sole cost and expenses, promptly undertake to eliminate or modify all such unacceptable matters to the reasonable satisfaction of Purchaser. Seller agrees to use its best efforts to satisfy promptly any such objections. In the event Seller is unable with the exercise of due diligence to satisfy said objections prior to the Closing Date, Purchaser may at its option, (i) accept title subject to the objections raised by Purchaser, without an adjustment in the Purchase Price, in which event said objection shall be deemed to be waived for all purposes, or (ii) rescind this Agreement, whereupon this Agreement shall be of no further force or effect and the Escrow Money shall be returned to Purchaser.

2

N JAG 538176 v3
2826075-000004  10/11/05

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 91 of 107 PageID #: 95

# OPTION AGREEMENT

# AND ESCROW INSTRUCTIONS

by and between

CRK REAL ESTATE, LLC, a Tennessee limited liability company

as "Seller"

and

RM WILSON COUNTY INVESTOR, LLC, a California limited liability company,

as "Buyer"

FIRST AMERICAN TITLE INSURANCE COMPANY

as "Escrow Holder"

LA // 126632188v2 / 39870.010200

Book 7

621

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 92 of 107 PageID #: 96



1. OPTION TO PURCHASE PROPERTY ...................................................... 1
   1.1 Description of Property ....................................................... 1
   1.2 Term of Option ................................................................. 1
   1.3 Option Consideration .......................................................... 2
   1.4 Option Exercise ................................................................ 2
   1.5 Partial Release ................................................................ 2
2. ESCROW ............................................................................ 3
3. PURCHASE PRICE .................................................................... 3
4. CLOSE OF ESCROW ................................................................... 3
   4.1 Payment of Purchase Price ..................................................... 3
   4.2 Seller's Escrow Deposits and Credits .......................................... 4
   4.3 Escrow Holder's Closing Responsibilities ...................................... 4
5. CONDITIONS TO CLOSE OF ESCROW; DEFAULT AND REMEDIES ............................... 5
   5.1 Conditions to Obligations of Buyer ............................................ 5
   5.2 Conditions to Obligations of Seller ........................................... 6
   5.3 Failure of Conditions to Close of Escrow ...................................... 6
   5.4 Breach/Termination ............................................................ 7
6. AS-IS PROVISION ................................................................... 9
7. REPRESENTATIONS, WARRANTIES AND DISCLOSURES OF PARTIES: ........................... 9
   7.1 By Seller ..................................................................... 9
   7.2 By Buyer: .................................................................... 10
8. RESTRICTIONS ON ASSIGNMENT: ..................................................... 10
   8.1 By Buyer ..................................................................... 10
   8.2 By Seller .................................................................... 10
9. SPECIAL COVENANTS: .............................................................. 11



KAELIN 0575
(Wilfong)

A // 126633183v2 / 39270.010200

i



## OPTION AGREEMENT AND ESCROW INSTRUCTIONS

THIS OPTION AGREEMENT AND ESCROW INSTRUCTIONS ("Agreement") is made and entered into as of the 25th day of September, 2006 ("Effective Date"), by and between CRK Real Estate, LLC, a Tennessee limited liability company ("Seller"), and RM Wilson County Investor, LLC, a California limited liability company ("Buyer"). Seller and Buyer are sometimes hereinafter referred to individually as a "Party" and collectively as the "Parties". Terms capitalized herein are defined in the text where the term is first used, except for proper names or other terms with obvious meanings.

## RECITALS

A.       Seller owns that certain real property located in the County of Wilson ("County"), State of Tennessee, as more particularly described on Exhibit "A-1" attached hereto (the "Owned Land"), has entered into a binding agreement to acquire the real property located in the County, State of Tennessee, as more particularly described on Exhibit "A-2" attached hereto (the "Contracted Land"), and has an option to acquire certain real property located in the County, State of Tennessee, as more particularly described on Exhibit "A-3" attached hereto (the "Optioned Land," and together with the Owned Land, and the Contracted Land, the "Land"). The Land comprises a portion of the Property (as defined below).

B.       Seller desires to grant to Buyer an option to purchase the Property, and Buyer also desires to receive from Seller an option to purchase the Property.



NOW, THEREFORE, in consideration of the mutual promises set forth in this Agreement, Seller and Buyer agree as follows:

1.       **OPTION TO PURCHASE PROPERTY.**  Seller hereby grants to Buyer an option (the "Option") to purchase the Property, subject to, and in accordance with, the terms and conditions of this Agreement.

1.1       **Description of Property.**  The following property shall collectively be defined as the "Property": (i) the Land, (ii) if any, all privileges, rights and easements appurtenant to the Land to the extent the same comprise Seller's interest in the Land, including, without limitation, minerals, oil, gas, and other hydrocarbon substances rights on and under the Land; development rights, air rights, water, and water rights relating to the Land; all rights in and to any streets, passages and trails; reservations and rights under utility agreements and other easements and rights-of-way included in, adjacent to or used in connection with the beneficial use and enjoyment of the Land; (iii) all of Seller's right, title and interest, if any, in and to all landscaping and other improvements located on the Land and all fixtures contained in any such improvements; and (iv) all of Seller's right, title and interest if any and to the extent assignable, in and to all entitlements, permits, licenses, approvals, utility rights, development rights and similar rights related to the Property, whether granted by governmental authorities or private persons.

1.2       **Term of Option.**  Provided that Buyer is not in default under this Agreement and subject to the provisions of this Section 1.2, Buyer shall have the right to exercise the Option during the period commencing on the Effective Date and terminating on the



1

KAELIN 0577
(Wilfong)

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 94 of 107 PageID #: 98



latest to occur of (i) the date that Seller has repaid all of its outstanding obligations under that certain loan in the aggregate principal amount of $20,500,000, as evidenced by that certain (A) Loan Agreement expected to be dated October 5, 2006 between Seller and Mt. Juliet Investor, LLC ("Lender"), and subject to the approval and consent of the parties thereto, and (B) $20,500,000 Promissory Note expected to be dated October 5, 2006, made by Seller, payable to Lender, and subject to the approval and consent of the parties thereto; and (ii) the date of Seller's complete winding up and dissolution; or upon such earlier date that Seller has, with the prior written consent of Buyer, closed the sale of all of the Property and received the proceeds therefrom, but in no case later than September 24, 2016 ("Option Termination Date"). The period commencing with the Effective Date through the Option Termination Date means the "Option Term". The Option and Option Term shall automatically expire, and be of no further force and/or effect, in the event that: (A) the Option Term expires without Buyer having exercised the same in strict accordance with terms and conditions hereof, (B) this Agreement is terminated for any other reason in accordance with its terms, or (C) if Buyer fails to acquire the Property on or before the Closing Date for any reason (other than Seller's breach of this Agreement). In the event that the Option expires, Seller shall be entitled to retain the Option Consideration, this Agreement shall be of no further force and effect and the Parties shall have no further obligations under the Option or this Agreement to each other. The Option herein granted to Buyer is to purchase all or any portion of the Property and may be exercised one or more times throughout the Option Term, in Buyer's sole and absolute discretion.



**1.3    Option Consideration.** Buyer shall deliver to Seller, on the Effective Date, the amount of One Hundred Dollars ($100.00) (the "Option Consideration") in immediately available funds as consideration for the Option. The Option Consideration shall be non-refundable to Buyer.



**1.4    Option Exercise.** Buyer shall exercise the Option, if at all, by delivering to Seller on or before the expiration of the Option Term, written notice (the "Exercise Notice") of its intent to exercise the Option and agreement to purchase the Property in accordance with the terms of this Agreement, and, if such exercise is for less than the entire Property, such Exercise Notice shall identify the portion of the Property Buyer intends to purchase. In the event Buyer exercises the Option and delivers an Exercise Notice as set forth above within the Option Term, (i) Seller agrees to sell the Property (or the applicable portion thereof) to Buyer, and Buyer agrees to purchase and accept the Property (or the applicable portion thereof) from Seller, in accordance with the terms and conditions set forth in this Agreement and (ii) the terms and conditions of this Agreement providing for the acquisition of the Property (or the applicable portion thereof) by Buyer and the closing of the acquisition transaction shall apply. To the extent that all or any portion of the Optioned Land is included among the Property that Buyer intends to purchase, Seller agrees that it shall exercise its option with respect to such Optioned Land and acquire fee title to such Optioned Land prior to the close of Escrow (as defined below).

**1.5    Partial Release.** Notwithstanding anything to the contrary herein, (i) to the extent that Seller's option to purchase the Optioned Land expires in accordance with its terms prior to Seller's exercise thereof, the Option granted to Buyer hereunder shall cease to include the Optioned Land which Seller (with Buyer's written consent) has allowed to expire, and (ii) to the extent that Seller has, with the prior written consent of Buyer, closed the sale of a portion of



Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 95 of 107 PageID #: 99



the Property and received the proceeds therefrom, the Option granted to Buyer hereunder shall cease to include such portion of the Property.

    2.    **ESCROW:** Escrow for this transaction ("Escrow") shall be with First American Title Insurance Company ("Escrow Holder"), which is located at First American Title Insurance Company, National Commercial Services, 315 Deaderick St, Suite 2055, Nashville, TN 37238, Attention: Dottie Potts. Escrow shall be opened upon Buyer's delivery of the Exercise Notice pursuant to Section 1.4 hereof. Escrow Holder is hereby authorized and instructed to provide written notice to the Parties upon opening of Escrow (herein, "Opening of Escrow") and act in accordance with the provisions of this Agreement, which Agreement, together with Escrow Holder's standard general escrow instructions attached hereto as Exhibit "B", shall constitute Escrow Holder's instructions. In the event that Buyer timely exercises the Option in accordance with this Agreement, the Escrow for the sale and purchase of the Property (or the applicable portion thereof) shall close ("Close of Escrow") upon recordation of a Special Warranty Deed in favor of Buyer and payment of sums due Seller, as more fully provided herein. As between the Parties, if there is a conflict between Escrow Holder's standard general escrow instructions and this Agreement, this Agreement will control.

    3.    **PURCHASE PRICE:** In the event that Buyer exercises the Option, the purchase price for the Property (or the applicable portion thereof) shall be Seventy Thousand Dollars ($70,000) per acre (the "Purchase Price").

    4.    **CLOSE OF ESCROW:** In the event that Buyer has timely exercised the Option pursuant to the terms hereof, Buyer shall deposit with Escrow Holder not later than the "Closing Date" (as hereafter defined), the Purchase Price. The "Closing Date" shall mean sixty (60) days after the delivery of the Exercise Notice, or such other date mutually agreed to by the Parties.

The procedure for Close of Escrow shall be as follows:

    4.1    **Payment of Purchase Price.** Buyer shall deposit with the Escrow Holder, on or before the Closing Date, certain documents and pay the Purchase Price as follows:

    (a)    Buyer shall deposit the Purchase Price in the form of (i) immediately available funds or (ii) a promissory note bearing interest at the then-effective short-term applicable federal rate under Internal Revenue Code Section 1274(d), which shall be due and payable in full on twelve (12) months from the Closing Date.

    (b)    Buyer shall deposit the amount necessary to pay the documentary transfer tax.

    (c)    Buyer shall deposit Buyer's allocable share of the prorated items set forth herein, any amounts to be paid by Buyer pursuant to Section 4.3(c), and any such other matters approved in writing by Buyer. In the event the aggregate of the items set forth in this subsection (b) results in a credit to Buyer (rather than a net charge), Buyer may offset the net credit against the Purchase Price.

    (d)    Buyer shall deposit such other evidence reasonably satisfactory to Escrow Holder that all necessary authorizations of the transaction provided herein have been



LA // 1266321\v2 / 39870.010200

KAELIN 0579
(Wilfong)







obtained by Buyer, and such other documents and instruments as may be reasonably requested by Escrow Holder in order to consummate the transaction contemplated hereby.

4.2 **Seller's Escrow Deposits and Credits.** Seller shall deposit with the Escrow Holder (or shall authorize a charge against sales proceeds of), on or before the Closing Date, all amounts, all documents, and perform all other acts necessary on the part of Seller to close Escrow, including, without limitation:

(a) Seller shall deposit the amount necessary to pay all Escrow fees.

(b) Seller's allocable share of the prorated items set forth herein, any amounts to be paid by Seller pursuant to Section 4.3(c), and any such other matters approved in writing by Seller.

(c) Seller shall deposit a fully executed and acknowledged Special Warranty conveying fee title to the Property (or the applicable portion thereof) to Buyer, subject to all matters of record and all matters which are discoverable by a survey and/or inspection of the Property.

(d) Seller shall deposit the fully executed Nonforeign Affidavit (as described in Section 16 hereof).

(e) Seller shall deposit such other evidence reasonably satisfactory to Escrow Holder that all necessary authorizations of the transaction provided herein have been obtained by such Seller, and such other documents and instruments as may be reasonably requested by Escrow Holder in order to consummate the transaction contemplated hereby.

4.3 **Escrow Holder's Closing Responsibilities.** Provided that Buyer had timely exercised the Option, and when all items required to be deposited by Seller and Buyer pursuant to this Section have been delivered into Escrow and all conditions to the Close of Escrow have been satisfied or waived, then in connection with the Close of Escrow, Escrow Holder shall perform the following duties:

(a) Escrow Holder shall record the Special Warranty conveying the Property (or the applicable portion thereof) to Buyer; record all other applicable documents required in connection with this Agreement; disburse to Seller the Purchase Price (after deducting applicable prorations and other charges allocated to Seller under this Agreement); deliver to Buyer the Nonforeign Affidavit; and disburse all other funds and instruments to the Party entitled thereto.

(b) With respect to the fiscal year in which the Closing Date occurs, Escrow Holder shall prorate ad valorem property taxes and special taxes, and any maintenance assessments imposed by a local government or public agency, if any, for such fiscal year based upon the number of days in the such fiscal year prior to the Closing Date (which shall be allocated to Seller) and the number of days in such fiscal year on and after the Closing Date (which shall be allocated to Buyer). In the event any prorations or apportionments made under this subparagraph (b) shall prove to be incorrect for any reason, then any Party shall be entitled to an adjustment to correct the same. If at the Close of Escrow any property taxes or assessments

LA/// 126632185v2 /39870.010200

KAELIN 0580
(Wilfong)

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 97 of 107 PageID #: 101



for the Property (or the applicable portion thereof) have not been established or are subject to appeal or contest, the apportionment thereof will be based upon the most recent information, and an adjustment will be made after the Close of Escrow upon demand of either Buyer or Seller to take account of final information when it becomes available. Notwithstanding the foregoing, any re-proration shall be made within 30 days after the information necessary to perform such re-proration is available. Seller and Buyer agree that (a) none of Seller's insurance policies relating to the Property (or the applicable portion thereof) will be assigned to Buyer (and Seller shall pay any cancellation fees resulting from the termination of such policies) and Buyer shall responsible for arranging for its own insurance as of the Closing Date; and (b) utilities, including telephone, electricity, water and gas, if any, shall be read on the Closing Date to the extent reasonably feasible (and, to the extent not reasonably feasible, such expenses shall be prorated between Buyer and Seller).

(c)     All other fees, including recording fees, taxes, document preparation fees, and similar costs not specifically allocated in this Agreement shall be divided according to the usual practices of the Escrow Holder in the area where the Property is located.

5.     **CONDITIONS TO CLOSE OF ESCROW; DEFAULT AND REMEDIES.** **Conditions to Obligations of Buyer.** Provided that Buyer had timely exercised the Option, the Close of Escrow and Buyer's obligation to purchase the Property (or the applicable portion thereof) is subject to the satisfaction, on or before the Closing Date, of all of the following conditions, each of which is for the benefit of Buyer and may be waived in writing by Buyer in its sole discretion:



(a)     Performance of Obligations. Seller shall have performed all of the obligations of Seller under this Agreement to be performed by Seller on or before the Closing Date.

(b)     Delivery of Items into Escrow. Seller shall have executed and delivered into Escrow all of the items required to be delivered by such Seller pursuant to Section 4.2 hereof.

(c)     Representations and Warranties. All of the representations and warranties of the Seller set forth this Agreement, including but not limited to, those representations and warranties set forth in Section 7.1 hereof, shall be true and correct in all material respects as of the Closing Date, as if made on and as of the Closing Date.

(d)     Escrow Holder's Obligations Satisfied. Escrow Holder is irrevocably committed and able to perform all of its obligations under Section 4.3 hereof.

(e)     No Bankruptcy or Dissolution. At no time on or before the Closing Date shall a Bankruptcy Event have occurred with respect to any Seller.

(f)     No Injunctions/Litigation. There shall be no pending or threatened litigation or injunctions in connection with the ownership or use of the Property (or the applicable portion thereof) (provided that this condition shall not apply to any litigation or injunctions related to Buyer's present or proposed ownership, use or development of the Property).

Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 98 of 107 PageID #: 102



(g)     <u>Hazardous Materials.</u> Except as disclosed or otherwise known to Buyer prior to the Closing Date, no person or entity other than Buyer and/or its agents or employees, has caused, between the Effective Date and the Closing Date, any Hazardous Materials to become present on or beneath the Property in violation of any Environmental Law. For purposes of this Section, "Hazardous Material" means (i) any substance that constitutes hazardous materials, hazardous waste, "special waste" or toxic waste within the meaning of any Environmental Law or that is otherwise subject to regulation under any Environmental Law and (ii) regardless of whether it is so classified, any radioactive material, radon, asbestos, any medical waste, polychlorinated biphenyls (PCB's), lead-based paint, urea formaldehyde foam insulation and petroleum or petroleum derivatives or by-products. "Environmental Law" means any law relating to the protection of the environment or, to the extent related to environmental conditions, human health or safety, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended; the Hazardous Materials Transportation Act, as amended; the Resource Conservation and Recovery Act, amended; the Toxic Substances Control Act, as amended; the Safe Water Drinking Act, as amended; the Clear Air Act, as amended; the Clean Water Act, as amended; and similar laws of the State of Tennessee.

5.2     <u>Conditions to Obligations of Seller.</u> Provided that Buyer had timely exercised the Option, the obligation of Seller to sell, convey, assign, transfer and deliver the Property (or the applicable portion thereof) to Buyer is subject to the satisfaction, on or before the Closing Date, of all of the following conditions, each of which is for the benefit of the Seller and may be waived by the Seller in its sole discretion:

(a)     <u>Option Consideration.</u> Buyer shall have timely delivered to Seller the Option Consideration as and when required pursuant to this Agreement.

(b)     <u>Performance of Obligations.</u> Buyer shall have timely performed all of the obligations of Buyer under this Agreement to be performed by Buyer on or before the Closing Date.

(c)     <u>Delivery of Items into Escrow.</u> Buyer shall have executed and delivered into Escrow all of the items, required to be delivered by Buyer pursuant to Section 4.1 hereof.

(d)     <u>Representations and Warranties.</u> All of the representations and warranties of Buyer set forth in this Agreement including, but not limited to, those representations and warranties set forth in Section 7.2 hereof, shall be true and correct in all material respects as of the Closing Date, as if made on and as of the Closing Date.

(e)     <u>Escrow Holder's Obligations Satisfied.</u> Escrow Agent is able to perform all of its obligations under Section 4.3 hereof.

5.3     <u>Failure of Conditions to Close of Escrow.</u> In the event one or more of the conditions to the Close of Escrow described in Section 5.1 of this Agreement are not satisfied or waived on or before the Closing Date, and the failure of such conditions to be satisfied is not a result of a default by Buyer, then Buyer shall have the right to terminate its obligation to purchase the Property (or the applicable portion thereof) and terminate the Escrow by giving




A # 126033188v2 / 39570.010200

6

KAELIN 0582
(Wilfong)



written notice of termination to the Seller and Escrow Agent. In the event one or more of the conditions to the Close of Escrow described in Section 5.2 of this Agreement are not satisfied or waived on or before the Closing Date, and the failure of such conditions to be satisfied is not a result of a default by the Seller, then Seller shall have the right to terminate its obligations to sell the Property (or the applicable portion thereof) and terminate the Escrow by giving written notice of termination to Buyer and Escrow Agent. In the event any Party elects to terminate its obligation to purchase or sell, as the case may be, and terminate the Escrow for the reasons and in accordance with the procedures set forth in this Section 5.3, Buyer's obligation to purchase, and Seller's obligation to sell, the Property (or the applicable portion thereof) shall automatically terminate and Seller and Buyer agree to execute such escrow cancellation instructions as may be necessary to effectuate the cancellation of the Escrow. In the event of a termination of the Agreement under this Section 5.3, any escrow cancellation and other cancellation charges shall be borne equally by the Seller, on the one hand, and Buyer, on the other hand. Upon the satisfaction by the Seller and Buyer of each of their respective obligations set forth in this Section 5.3, neither Seller nor Buyer shall have any further rights or obligations to each other.

5.4    **Breach/Termination.** In the event Seller or Buyer fails to perform any of their respective obligations to be performed prior to the Close of Escrow, other than in the case of Buyer's termination of this Agreement pursuant to Section 5.3 (as a result of a failure of a condition described in Section 5.1), then the non-breaching Party may elect the applicable remedies set forth in this Section 5.4 which remedies shall constitute the sole and exclusive remedies of the non-breaching Party with respect to a default by the other Party under this Agreement.

(a)    Remedies of Buyer. In the event Buyer is the non-breaching Party, as Buyer's sole and exclusive remedy, Buyer may elect, after Seller's breach shall continue for a period of ten (10) days after written notice received from Buyer, to either: (i) pursue the equitable remedy of specific performance, (ii) terminate its obligation to purchase the Property (or the applicable portion thereof) and terminate the Escrow by giving Seller and Escrow Agent written notice describing Seller's default and setting forth Buyer's election to immediately so terminate its obligation to purchase the Property (or the applicable portion thereof) and the Escrow, or (iii) if the remedy of specific performance is not available as a remedy as a result of Seller's default, Buyer shall have the right to terminate this Agreement and shall be entitled to recover from Seller Buyer's actual out-of-pocket costs and expenses (including legal fees and costs) in connection with the transaction contemplated by this Agreement.

(b)    Remedies of Seller. In the event Seller is the non-breaching Party and Buyer's breach shall continue for a period of five (5) days after written notice received from Seller (provided that no notice shall be required nor shall any cure period be permitted with respect to defaults by Buyer of monetary obligations) or in the event that the Option expires by its terms or Buyer otherwise fails to timely exercise the Option in accordance with this Agreement (including, but not limited to, the requirements of Section 1 hereof), as Seller's sole and exclusive remedy for Buyer's breach or the expiration and termination of the Option (other than for the commencement and maintenance of legal proceedings to enforce the provisions of Section 5.4(b) hereof), Seller shall be released from its obligation to sell the Property (or the applicable portion thereof) to Buyer, the Escrow shall terminate and Seller shall retain the Option Consideration.



Case 3:14-cv-01052   Document 1-1   Filed 04/24/14   Page 100 of 107 PageID #: 104

(c)   LIQUIDATED DAMAGES:   THE PARTIES INTEND THAT THE OPTION CONSIDERATION SHALL BE NONREFUNDABLE UPON THE DELIVERY OF SUCH OPTION CONSIDERATION BY BUYER IN ACCORDANCE WITH THIS AGREEMENT SOLELY IN CONSIDERATION FOR SELLER GRANTING TO BUYER THE OPTION AND THE OTHER RIGHTS GRANTED TO BUYER UNDER THIS AGREEMENT. BUYER RECOGNIZES THAT THE PROPERTY WILL BE UNAVAILABLE FOR SALE DURING THE EXISTENCE OF THIS AGREEMENT. WITH THE FLUCTUATION IN LAND VALUES, THE UNPREDICTABLE STATE OF THE ECONOMY AND OF GOVERNMENTAL REGULATIONS, THE FLUCTUATING MONEY MARKET FOR REAL ESTATE LOANS OF ALL TYPES AND OTHER FACTORS WHICH DIRECTLY AFFECT THE VALUE AND MARKETABILITY OF THE PROPERTY, IT IS REALIZED BY THE PARTIES THAT IT IS EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN WITH ANY DEGREE OF CERTAINTY THE AMOUNT OF DAMAGES WHICH WOULD BE SUFFERED BY SELLER IN THE EVENT BUYER ELECTED NOT TO EXERCISE THE OPTION IN ACCORDANCE WITH THIS AGREEMENT, OR ELECTED TO EXERCISE THE OPTION AND PROCEED WITH THE PURCHASE OF THE PROPERTY ON OR BEFORE THE EXPIRATION OF THE OPTION TERM BUT THEN DEFAULTS IN ITS OBLIGATION THEREAFTER TO CLOSE ESCROW AS REQUIRED HEREIN. THE PARTIES (HAVING MADE DILIGENT BUT UNSUCCESSFUL ATTEMPTS TO ASCERTAIN THE ACTUAL DAMAGES SELLER WOULD SUFFER IN THE EVENT THAT BUYER FAILS TO EXERCISE THE OPTION OR ELECTS TO EXERCISE THE OPTION AND THEREAFTER FAILS TO CLOSE ESCROW AS REQUIRED BY THIS AGREEMENT, SUCH FAILURE BEING FOR ANY REASON EXCEPT FOR (I) A DEFAULT OF ANY SELLER OR (II) THE FAILURE OF ANY CONDITION TO BUYER'S OBLIGATION TO PURCHASE THE PROPERTY AS SET FORTH IN THIS AGREEMENT) HAVE AGREED THAT SELLER SHALL BE ENTITLED TO RETAIN ALL AMOUNTS DELIVERED BY BUYER AS THE OPTION CONSIDERATION AS COMPENSATION FOR THE DETRIMENT DESCRIBED ABOVE. IN SUCH EVENT, THIS AGREEMENT SHALL TERMINATE, AND THE PROVISIONS SET FORTH ABOVE SHALL BE THE EXCLUSIVE REMEDIES OF SELLER (OTHER THAN THE COMMENCEMENT AND MAINTENANCE OF LEGAL PROCEEDINGS TO ENFORCE THE PROVISIONS OF SECTION 5.4(b) HEREOF) BY REASON OF SUCH FAILURE TO EXERCISE THE OPTION OR BUYER'S DEFAULT AFTER EXERCISE OF THE OPTION. BY INITIALING BELOW, THE PARTIES AGREE TO THE PROVISIONS OF THIS SECTION AND ACKNOWLEDGE THAT RETENTION BY SELLER OF THE AMOUNTS SPECIFIED SHALL BE CONSTRUED AS CONSIDERATION FOR THE OPTION (OR IN THE EVENT OF BUYER'S DEFAULT AFTER EXERCISE OF THE OPTION, AS LIQUIDATED DAMAGES) AND NOT AS A PENALTY, FOR BUYER'S FAILURE TO PERFORM.

_____     _____
Buyer's Initials        Seller's Initials

(d)   Cancellation Instructions and Costs.   Upon any termination pursuant to Section 5, the Buyer's obligation to purchase, and Seller's obligation to sell, the Property will automatically terminate without any further acts of Seller or Buyer, and Seller and Buyer agree to execute such Escrow cancellation instructions as may be necessary to effectuate the cancellation of the Escrow as may be required by Escrow Agent. The breaching Party

8



hereunder shall pay any and all Escrow cancellation and other cancellation charges. Upon the satisfaction by Seller and Buyer of each of their respective obligations set forth in Section 5, neither Seller nor Buyer shall have any further rights or obligations to each other.

6. **AS-IS PROVISION:** Except as expressly represented, warranted or covenanted by Seller in this Agreement, the Special Warranty or any other documents entered into by the Seller pursuant to the terms of this Agreement (the Special Warranty, together with any other documents entered into by Seller pursuant to the terms of this Agreement, collectively, the "Collateral Documents"), in the event that Buyer has delivered the Exercise Notice pursuant to Section 1.4 hereof, Buyer agrees that it will have satisfied itself, in its sole and absolute discretion, as to the feasibility, desirability and suitability of the Property for Buyer's intended use and purpose; the physical and environmental condition of the Property; the zoning, building and land use restrictions applicable thereto; and all other matters which Buyer deems relevant to its purchase. Buyer understands, acknowledges and agrees that, except as expressly represented, warranted or covenanted by Seller in this Agreement or the Collateral Documents, the sale and conveyance of the Property (or the applicable portion thereof) to Buyer hereunder shall be made in an "AS IS" condition and "WHERE IS AND WITH ALL FAULTS" basis. Buyer expressly acknowledges that it is relying on its own inspection, analysis, examination and investigation of the Property (or the applicable portion thereof), and expressly without Seller's covenant, warranty or representation as to physical condition, title, leases, rents, revenues, income, expenses, operation, zoning or other regulation, compliance with law, suitability for particular purposes or any other matter whatsoever, except as otherwise expressly provided in this Agreement or the Collateral Documents.

7. **REPRESENTATIONS, WARRANTIES AND DISCLOSURES OF PARTIES:**

7.1 By Seller.

(a)   Seller represents and warrants to Buyer that it has the power and authority to enter into and perform the obligations contemplated by this Agreement.

(b)   Seller represents and warrants to Buyer that: (i) this Agreement has been duly executed and delivered by Seller, and is a valid and binding obligation of Seller, enforceable in accordance with its terms and (ii) neither the entering into this Agreement nor the consummation of this transaction will constitute a violation or breach by Seller of any contract or other instrument to which it is a party, or to which it is subject, or by which any of its assets or properties may be affected or any judgment, order, writ, injunction or decree issued against or imposed upon it, or will result in a violation of any applicable law, order, rule or regulation of any governmental authority.

(c)   Seller represents and warrants to Buyer that there are no attachments, assignments for the benefit of creditors (including, without limitation, any tax authorities), receiverships, conservatorships or voluntary or involuntary proceedings in bankruptcy or any other debtor relief actions contemplated by Seller or presently filed by Seller, nor is Seller insolvent within the meaning of Tennessee law (nor will Seller's performance pursuant to the provisions hereof result in such insolvency), nor to the best of Seller's knowledge

9



A // 12653218613 / 39870.010200                                                                      KAELIN 0585
                                                                                                                        (Wilfong)

9. **SPECIAL COVENANTS:**

9.1 **No Further Encumbrances.** Until the earlier of the Close of Escrow, termination of the Option or the termination by Buyer or Seller of their right and obligation to complete the transfer of the Property (or the applicable portion thereof), Seller will not (except as permitted by Buyer in writing) (i) grant, create or allow the creation of any easement, right-of-way, encumbrance, lien, restriction, or assessment on title which affects the Property or (ii) amend, extend or otherwise modify the terms of any existing easement, right-of-way, encumbrance, lien, restriction or assessment which affects the Property.

9.2 **No Competing Contracts; No Competing Sales.** Seller agrees that, until the earlier of the Close of Escrow, termination of the Option or the termination by Buyer or Seller of their right and obligation to complete the transfer of the Property pursuant to this Agreement, Seller will not (except as otherwise permitted by Buyer or pursuant to Section 8.2 of this Agreement): (i) enter into any contract for the sale of the Property to any person other than Buyer, or (ii) sell, convey, lease or otherwise transfer all or any part of the Property to any person other than Buyer.

9.3 **Certain Interim Covenants of Seller.** Until the Closing Date or the sooner termination of this Agreement:

(a) Seller shall maintain the Property in the same manner as prior hereto pursuant to its normal course of conduct;

(b) As of the Closing Date, Seller shall at its sole cost and expense terminate all leases, rental or leasing agreements, service or maintenance contracts, loan agreements and mortgages relating to the Property, if any, arising by through or under Seller, and not previously consented to in writing by Buyer, and shall defend, indemnify and hold Buyer harmless therefrom; and

(c) Seller shall maintain its existing insurance policies, if any, for the Property through the Closing Date.

10. **MEMORANDUM OF OPTION AGREEMENT:** Concurrently with the execution and delivery of this Agreement, the Parties shall deliver to the Escrow Holder duly executed original copies of a Memorandum of Option Agreement, in such form attached hereto as **Exhibit "C"** ("Memorandum"), which Memorandum shall be recorded in the Official Records of the County of Wilson, Tennessee upon receipt thereof by the Escrow Holder. The Memorandum shall be amended from time to time as necessary to reflect (i) Seller's acquisition of the Contracted Land, (ii) Seller's acquisition of the Optioned Land, and/or (iii) the release of any portion of the Property with respect to which Seller has, with the written consent of Buyer, sold, closed and received the proceeds therefrom. To the extent that Red Mountain Retail Group, Inc. or Pulte Homes Tennessee, LP does not acquire all of Parcel 8, as identified in **Exhibit "A-4"**, then the Memorandum shall be amended to include such portion of Parcel 8 that is not acquired.

KAELIN 0537
(Wilfong)

LA # 12663218892 / 39570.010200



Notices so sent shall be deemed to have been given and received when personally delivered or transmitted by electronic mail, when confirmed (if by telecopy), when delivered or refused (if by overnight courier) or on the third day following deposit of same in any United States Post Office mailbox, postage prepaid (if by mail), addressed as set forth above.

13. **TIME:** Time is of the essence for each provision of this Agreement of which time is a factor.

14. **ATTORNEYS' FEES:** In the event of any action or proceeding brought by either Party against the other under this Agreement, the prevailing Party shall be entitled to recover its actual attorneys' fees and all fees, costs and expenses incurred for prosecution, defense, consultation, or advice in such action or proceeding. In addition to the foregoing the prevailing Party shall be entitled to its actual attorneys' fees and all fees, costs and expenses incurred in any post-judgment proceedings to collect or enforce the judgment. This provision is separate and several and shall survive the merger of this Agreement into any judgment on this Agreement.

15. **INTERPRETATION:** The Parties hereto acknowledge and agree that each has been given the opportunity to review this Agreement with legal counsel independently, and/or has the requisite experience and sophistication to understand, interpret, and agree to the particular language of the provisions hereof. The Parties have equal bargaining power, and intend the plain meaning of the provisions herein. In the event of an ambiguity in or dispute regarding the interpretation of same, the interpretation of this Agreement shall not be resolved by any rule of interpretation providing for interpretation against the Party who causes the uncertainty to exist or against the draftsman. Whenever the words "including", "include" or "includes" are used in this Agreement, they should be interpreted in a non-exclusive manner as if they were immediately followed by ", without limitation".

16. **NON-FOREIGN PERSON; OTHER WITHHOLDING:** Seller represents and warrants to Buyer that Seller is not, and will not be at the time of Close of Escrow, a "Foreign Person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended. On or prior to the Close of Escrow, Seller shall deliver an affidavit evidencing such compliance and, if requested by Buyer, a properly executed Tennessee equivalent to establish that Buyer is not required to withhold any portion of the Purchase Price otherwise mandated under the Internal Revenue Code of 1986 or Tennessee law (the "Nonforeign Affidavit").

17. **APPLICABLE LAW AND SEVERABILITY:** This document shall, in all respects, be governed by the laws of the State of Tennessee applicable to agreements executed and to be wholly performed within the State of Tennessee. Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision contained herein and any present or future statute, law, ordinance or regulation contrary to which the Parties have no legal right to contract, the latter shall prevail but the provision of this document which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

18. **FURTHER ASSURANCES:** Each of the Parties hereto shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all



13

A // 12663218v2 / 39870.010200

KAELIN 0529
(Wilfong)



## CONSENT OF ESCROW HOLDER

The undersigned Escrow Holder hereby agrees to (i) accept the foregoing Option Agreement, (ii) be Escrow Holder under said Option Agreement, (iii) to make all filings required under Section 5045 of the Internal Revenue Code of 1986, as amended, and (iv) be bound by said Option Agreement in the performance of its duties as Escrow Holder; provided, however, the undersigned shall have no obligations, liability or responsibility under (a) this Consent or otherwise, unless and until said Option Agreement, fully signed by the Parties, has been delivered to the undersigned, or (b) any amendment to said Option Agreement unless and until the same is delivered to the undersigned.

Dated: _____, 2006

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____

Its: _____



KAELIN 0594
(Wilfong)

A // 126632185v2 / 39870.010200

IN WITNESS WHEREOF, Seller and Buyer have duly executed this Agreement as of the date first above written.

"Seller"

"Buyer"

CRK REAL ESTATE, LLC,
a Tennessee limited liability company

RM WILSON COUNTY INVESTOR, LLC,
a California limited liability company

By:

By:

Name: CHARLES R. KAELIN, JR.
Title: MEMBER

Name:
Title:

KAELIN 0593
(Wilfong)

LA // 126632185v2 / 39670.010200



**EXHIBIT "A-1"**
**TO OPTION AGREEMENT**

**LEGAL DESCRIPTION OF OWNED LAND**



KAELIN 0595
(Wilfong)

LA // 126632188v2 / 39170.010200